Commonwealth *v.* Petrillo, Appellant.

Argued January 22, 1940.   Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*Harry M. Berkowitz,* for appellant.

*Vincent P. McDevitt,* Assistant District Attorney,
with him *Charles F. Kelley,* District Attorney, for ap-
pellee.

OPINION BY MR. JUSTICE MAXEY, March 27, 1940:

Herman Petrillo appeals from the sentence of death
imposed upon him after he was convicted on March 23,
1939, of murder in the first degree upon an indictment
charging him and Stella Alfonsi with the wilful and
malicious killing of the latter's husband, Ferdinand Al-
fonsi, who died of arsenical poisoning on October
27, 1938.   Appellant elected to be tried separately.
It was alleged that the motive for the homicide was
the collection by Mrs. Alfonsi of the proceeds of
insurance policies she had been carrying, as sole
beneficiary, for about two years on the life of her
husband, though it happened that the largest policy,
one for $2,000, had lapsed 27 days before his death.
Some small industrial insurance policies had also lapsed,

and Alfonsi died with only $400 "death benefits." Mrs. Alfonsi was acquitted of her husband's murder on October 27, 1939.

The Commonwealth's chief witness was a man who was called George Myer, but who admitted on cross-examination that his real name was Newmyer and that in 1927 he served eight months and ten days of a ten months sentence in a Wilmington jail for "conspiracy to commit forgery." On June 30, 1938, Myer was introduced to defendant, Petrillo, by Domenick Polcino, whom Myer had met when both were in the Wilmington jail. Myer testified: "Polcino told Petrillo [defendant] that I needed $25.00 to keep my business up. . . . He [defendant] asked me why stop at $25 when I had a chance to make $500. So I asked him what his proposition was and he told me to bump off a guy, . . . a fellow by the name of Ferdinand Alfonsi." Myer said he asked defendant "why he didn't do the job himself" and the latter replied: "Well, I know this man and I can't do it but I just knocked a guy off five days ago, but I didn't know him so good." Myer testified that defendant showed him an iron pipe eighteen inches long, which he wanted him to hit Alfonsi over the head with and then throw the latter downstairs to make it look like an accident, that on the following day defendant told him he had made arrangements with Mrs. Alfonsi for her "to go at 8 o'clock to a show with her two children and be back again after the job was completed," that he (Myer) "went around that night" to see "whether Mrs. Alfonsi was really connected with this in any way" and that he saw her leave about 8 o'clock and come back a quarter to eleven; that the next morning he told defendant that he was to the house and nobody was there, and defendant said he would make arrangements for him to do the job that night, that defendant later suggested that Myer kill Alfonsi by hitting him over the head with a bag of sand, that defendant said he made arrangements for Mrs. Alfonsi to put a white

towel on the back fence so that Myer would get to the right house, that defendant later took Mrs. Alfonsi to her mother's in Bristol for ten days during which time Myer was supposed "to do the job," and that defendant offered to give him $500 in lawful money or $2,500 in counterfeit money to do this. Myer had no conversation at any time with Mrs. Alfonsi except on September 5, 1938, when, according to his testimony, he went to the Alfonsi home and "asked for the contractor" and was informed by her that "he has been very sick." Myer then asked his name and she replied: "Alfonsi." Myer then said to her: "I am looking for Periniti, the contractor." She replied: "He is over on Clearfield Street, Belgrade Street." Myer said he told defendant that he had a friend who "just came out of Trenton from doing three years . . . for murder" and "he will do the job" and that defendant asked him to "bring him along."

Myer claims that he then "went to the Secret Service" and "explained everything" and Stanley B. Phillips was assigned to work with him. Phillips at the time was an agent of the United States Secret Service and was assigned to this case (so he testified) by his Chief, W. A. Landvoight, shortly before August 1, 1938. On this latter date he first met the defendant in the store of Domenick Polcino at 1802 East Thayer Street, Philadelphia. Myer said he and Phillips "proceeded to dicker" with defendant for the counterfeit money, that defendant suggested to him and Phillips that they take Alfonsi "out in an automobile, ask him to look at the headlights and then run over him and then keep on going," or that they "take him down to the beach for a swim and say that he did not come out of the water again," that they kept "stalling" defendant off and later found that Alfonsi was very sick, and that they later met defendant who told them they "didn't have to go ahead with the job" because Alfonsi was in the hospital, and that defendant said: "The fools in the hospital think he has got influenza or pneumonia. . . . I gave

him enough arsenic to kill six men." Myer said that when defendant talked about having given Alfonsi arsenic, he questioned defendant as to how he knew that "the arsenic would work," and he replied: "It worked on the other job. I know it will work on this one."

Phillips testified that Myer introduced him to defendant in Polcino's store assuring defendant that he (Phillips) could be "trusted," that he met defendant three or four times a week between August 1st and September 20th and that on "almost all of these occasions some mention was made of this particular 'job' that we were supposed to do." He said that defendant told him Alfonsi was insured and "if this man died as the result of what appeared to be an accident that the double indemnity clause would be in force."

Dr. Henry E. D'Alonzo, who attended Alfonsi, testified that he thought at the time that Alfonsi had pneumonia or a toxic condition. After treating him for a few days, Alfonsi kept getting worse and he told both Alfonsi and his wife that he was going to take Alfonsi. to the hospital, that Alfonsi was "eager to come to the hospital," but that Mrs. Alfonsi insisted, "No, no, no, I don't want him to go to the hospital. I will pay any amount of money that it costs. I want him to stay home." The doctor testified that the next day he convinced Mrs. Alfonsi that her husband should be taken to the hospital by telling her that he would be there only a half hour for the purpose of getting an X-ray taken, and that her husband was then taken to the hospital. Mrs. Alfonsi told the doctor that defendant recommended him to her. The doctor also testified that sometime prior to his treating Alfonsi, defendant came to his office for examination and while there offered the doctor "two or three hundred dollars" for "typhoid germs" and the doctor said he told defendant to "get out."

Dr. Strawbridge, who attended Alfonsi at the hospital, testified that the city chemist's report showed "that ar-

senic had been found in large quantities in the urine" and that Alfonsi suffered "severe pains and distress in the joints," and that the patient's death on October 27th was caused by "paralysis of the muscles of respiration as a result of arsenic poison."

A druggist testified on behalf of the Commonwealth that defendant on two different occasions made inquiry and attempted to buy poisons and live typhoid germs from him.

John Cacopardo was called by the Commonwealth as a witness and was permitted to testify over the objections of defendant's counsel, to a conversation between his uncle, Paul Petrillo, and himself. Only a small portion of this conversation was in the presence of defendant. The gist of the conversation that the witness related and which was not in the presence of defendant, was that Paul Petrillo tried to induce him to drop certain powder in a glass of beer to be administered to an unnamed man which Paul said he had insured for $500. Later "Uncle Paul" also suggested to the witness a plan for killing Domenick Starace. He said he told his uncle that "if anything happens to Domenick Starace I will expose you. I will tell everything I know." He said that Paul then threatened to kill him. Later his Uncle Paul and the latter's mistress, Rose Carina, went to Brooklyn to the Starace family. The witness visited them there. He said that Molly Starace (Mrs. Starace's daughter) had a certain letter that the witness wanted to get, that he, his Uncle Paul and Molly entered the latter's bedroom, and the witness said: "Molly, I know what is going on here, and I do not want to have any part of it. . . . If anything happens, I do not want to be implicated in it. If anything happens to your father—your stepfather—I am going to tell everything." Molly noticed that the witness had a gun and she told his Uncle Paul. While the witness and his uncle were struggling for possession of it, the uncle "pressed the gun" and the witness fainted. While Caco-

pardo was on the stand, the Commonwealth put in evidence, over objection, a letter allegedly written by Paul Petrillo to Molly Starace in which he suggested that the only way to "quiet" Molly's stepfather was "to send him to 'California'" (meaning as it was testified later, to kill him). The word "California" was underscored. The letter then said: "Johnny [Cacopardo] understands what I mean, and I could do it in twenty-four hours or a week. Anyway you want it, but it will cost your mother $500. Let me know if there is any insurance on his life. If not, take all you can get and when the time comes I will take care of it." The Commonwealth also produced in evidence a correspondence card written on both sides by Molly Starace to Paul Petrillo, in which she refused to accept the suggestion of Paul that she have her stepfather murdered. She said: "We will have to let it go for the present." The card was found in Paul Petrillo's tailor shop in Philadelphia. It appeared in the evidence that John Cacopardo murdered (by shooting) Molly Starace on December 13, 1936, and he was convicted in Brooklyn, New York, and sentenced to Sing Sing Prison for a term of from thirty years to life.

There was also evidence that one Raeffele Caruso, a cripple who was unable to work, was placed in the house of Christine Cerrone, a niece, and that several policies of insurance were placed on his life. Christine Cerrone was named as beneficiary in most of these policies. In one policy the defendant was the beneficiary under the name of "Herman Caruso, brother," and in another he was beneficiary in his own name, as a nephew. Caruso met his death by drowning in the Schuylkill River. There was no evidence of violence. There was no proof that Caruso had been murdered; in other words, no "corpus delecti" was established as to him.

Mrs. Rose Starace testified that Paul Petrillo told her that he performed "his magic with magic powder." He said to her: "We take a little powder; we light up

a glass of alcohol; we call upon a certain spirit and with a snap of the finger the person we want to get rid of dies. I have a cousin of mine, Herman Petrillo [obviously the defendant]; he has a lot of connections in New Jersey. And my nephew in New York and me in Philadelphia. If anybody dies like that we have our own undertaker and we have our own doctor."

The Commonwealth called as its witness Sergeant Riccardi of the Philadelphia Homicide Squad. He testified that he arrested Mrs. Carina Favata on October 17, 1938, that she made a statement to him and over defendant's objection he read this to the jury. The salient points in the statement are these: She began living as a "common law wife" with Charles Ingrao in 1925, who died "in August 1934 or 1935." She carried $5,000 insurance on his life. This was paid her after his death. He had two children "in the Catholic Bureau": Philip and Michael. The former was sixteen years of age when he came to live with her on August 29, 1936. Six months later Michael came to live with her. Philip "got sick" on June 7, 1938, and died shortly afterwards (exact date not given). She listed the following insurances she had on this boy: $2,500 in Prudential Life Insurance Company; "about $1,400" in the John Hancock Life Insurance Company; "about six or eight hundred dollars" in the Home Life Insurance Company; "one thousand" dollars in the Monumental Life Insurance Company; $500 in the State Mutual Benefit Society; $500 in the Prudential Company; and $200 in the Tribune Association. She was the beneficiary in these policies which total $6,900.[1] She also carried on the boy Michael a policy for $1,000 in the Prudential Life Insurance Company and two other policies in other companies totaling $750. She also carried a policy (amount not stated) on a

---

[1] According to the testimony of several insurance agents, the total insurance Mrs. Favata carried on the life of her stepson Philip, was $6,382 and on the life of her husband, Charles, $8,413.

"boarder" named Rafael Pacelli, and a policy for $1,000 on her own son, Joseph Pandarelli.

Of these persons who were thus insured by Mrs. Favata two died: her common-law husband and her stepson Philip; after their bodies were exhumed and a chemical analysis made of their vital organs, the cause of death was found to be "arsenical poisoning."

On February 7, 1937, Guiseppe DiMartino died. Twenty-two months later his body was exhumed and it was found after analysis that his stomach, kidneys and liver were "positive for arsenic." Agent Shearn "got a lead" on DiMartino from one Ralph Picelli and insured DiMartino for $2,000. Agent Casale placed a policy for $500 on DiMartino. The latter paid the premium. Casale did not know the defendant. Agent Milici in March, 1936, placed a policy on DiMartino for $496. The insured paid the premium and gave the agent all necessary information. Defendant had nothing to do with the matter. The insured's wife was the beneficiary. (The good faith of none of these agents is challenged.) Mrs. Favata knew the DiMartinos but it does not appear that she had anything to do with the matter of placing the insurance. Three months after the insured died Mrs. Favata went with Mrs. DiMartino to the claim department of the Home Life Insurance Company and "gave the superintendent an argument" about one policy on which there was a contest because a boarder named Muselli had signed an application which supposedly was signed by DiMartino. The defendant appeared in this case only when three months after DiMartino's death, he met a man named Corigliano, an employee of the Home Life Insurance Company whom the defendant knew well enough to talk to a few times a week and asked him "how the company refused to pay DiMartino's claim." The agent said: "How come you are interested in this connection?" and defendant answered: "Oh well, after all, you know the woman mixed up the God damned thing."

Mrs. DiMartino said she received a check for $1,979 from the John Hancock Life Insurance Company and endorsed and gave it to Mrs. Favata, who told her "it was a funeral benefit paper to be signed." Mrs. DiMartino collected $2,200 herself from the other companies. Defendant had nothing to do with these policies. Mrs. DiMartino said: "I don't know him at all." She had taken out these policies at the instance of the insured himself.

Two books were found in defendant's home on September 27, 1938. One book was known as "Mallinckrodt Chemical, Price List of March, 1938, for Medicinal, Photographic, Analytical and Industrial Uses, Over Fifteen Hundred Chemicals for the Prescription Druggist." The other book was "Merck Chemicals—Medicinal, Analytical, Technical, Photographic, Price List of April, 1938." There were check marks after the words: "Acid Arsenic Merck" and "Acid Arsenous Merck."

If evidence of *other crimes* is to be admitted to support a charge of murder, such evidence, as the present Chief Justice pointed out in *Com. v. Winter*, 289 Pa. 284, 291,[2] 137 A. 261, must "amount to proof" of that other crime and there must be "ground to believe *that the crime charged grew out of it.*" Mere *suspicion* of the commission of another crime will not do; also, a relationship between the "other crime" and the crime pleaded must be shown. By this standard must the admissibility of the evidence of the alleged *other crimes* above referred to be judged. Paul Petrillo's letter to Rose Starace and her reply are inadmissible *unless criminally linked with this case.* So is the evidence relative

---

[2] Justice SCHAFFER quoted from *Com. v. Ferrigan,* 44 Pa. 386, as follows: "On the trial of a criminal prosecution, where the facts and circumstances offered in evidence amount to proof of a crime other than that charged, and there is ground to believe *that the crime charged grew out of it,* or was caused by it, such facts and circumstances may be admitted to show the quo animo of the accused."

to the deaths of DiMartino and Caruso. Cacopardo's murder of Rose Starace should not have entered this record unless its relevancy to the fact in issue appeared. The same is true of John Cacopardo's testimony as to statements *made by others when the defendant was not present.* The record, instead of showing Cacopardo to have been a co-conspirator with defendant, *shows* the *contrary.* In his testimony Cacopardo said that when, on November 1, 1936, the defendant invited him to join him (i. e., defendant) and Paul Petrillo in "dropping powder in the beer of a certain old man" (name not disclosed) "who was insured for $500," Cacopardo replied: "I won't have anything to do with putting any powder in anybody's drinks." He added: "We let it go at that."

We will first consider the 10th, 11th, 12th and 13th assignments of error, which relate to the death of Mrs. Favata's common-law husband and her stepson and to the insurance policies she had taken out on their lives, for her own benefit. The subject of the 10th and 11th assignments is the admission in evidence of the conversation between Sergeant Samuel Riccardi and Mrs. Carina Favata.

The 12th and 13th assignments are based upon the admission in evidence of applications and policies of insurance and payments of death benefits, on the lives of Philip Ingrao and Charles Ingrao and other testimony in re: their deaths, their embalming, etc. Samuel Carr testified that the application for insurance on Philip Ingrao was written at the home of Mrs. Favata. When asked on cross-examination: "Herman Petrillo had nothing to do with this application so far as you were concerned, did he?" answered: "In so far as I knew. . . . I got this prospect from Mrs. Favata's mother. That is, she sent me up,—said her daughter wanted some insurance. When I got there, she said she wanted the insurance on this boy—that she wanted the most insurance she could get." The application was later rejected. Thomas A. Shearn testified that at the request

of Mrs. Favata the John Hancock Life Insurance Company accepted an application for insurance on the life of Philip Ingrao in the sum of $1,594, in October, 1936. Mrs. Favata was the beneficiary. He was asked: "Did you ever see the defendant in the Favata home?" He answered: "Quite frequently." He testified on cross-examination that, so far as he knew, the defendant had nothing to do with the application and would not benefit by the death of the insured. William A. Jones, an insurance agent, testified as to writing an industrial policy on the life of Philip Ingrao in the sum of $250. He was asked with whom he had his dealings and he answered: "Mrs. Favata, the beneficiary. A Mrs. De Luca took him to the house. Another policy for $250 was issued on the life of Philip at the request of Mrs. Favata. On the death of Philip the amounts of these policies were paid to Carina Favata. There was other testimony to the same tenor in regard to other insurance policies issued on the life of Philip at Mrs. Favata's request and for her benefit. Agent Jones said that the defendant's name "was not on the policies."

This case was tried as though the indictment charged the defendant and Mrs. Alfonsi and Mrs. Favata and Paul Petrillo and divers other persons with a conspiracy to defraud insurance companies by the wholesale murder of policyholders. This misconception of the issue is responsible for the muddled state of this record. A trial judge in a criminal case should never lose sight of the indictment. It has been aptly said that "the indictment is the star and compass of a criminal trial." Chitty on Criminal Law 238 states: "All indictments ought to charge a man with a particular offense and not with being an offender in general." 2 Hale Pl. Cr. says: "The accusation ought to be identified." An indictment must be a notification to the defendant of the charge he has to meet.

The indictment in this record charges *only two defendants* with murder. There is *no* count charging the

defendants and divers other persons to the Grand Inquest unknown with conspiracy to defraud insurance companies or to commit murder. We *can* hold as some jurisdictions do hold (and there is dictum in some of our opinions to that effect), though others hold the contrary,[3] that an indictment charging two persons jointly with murder, does *by implication* charge *those* two persons with conspiracy to commit murder.[4] But no court can hold that an indictment of two persons for murder does by implication charge not only those two persons but also *other persons* with conspiracy to commit murder. The testimony of Sergeant Riccardi as to what Mrs. Favata said was not admissible as the declarations of a co-conspirator with this defendant.

Furthermore, even if the indictment contained a count for conspiracy and named Mrs. Favata as a conspirator with this defendant in the murder of Alfonsi, there was failure of proof to sustain *that* charge. Even if there was proof that she and this defendant conspired to murder her *own husband and stepson,* that would not make her statement to a third person, in the course of that conspiracy, admissible against *this defendant* on his trial for the murder of *Alfonsi* unless the two conspiracies were criminally connected. If A and B enter into

---

[3] In *Com. v. Derry,* 108 N. E. 890, the Supreme Judicial Court of Massachusetts held that in a prosecution for being an accessory before the fact to the burning of defendant's factory to defraud the insurers, where it did not appear that defendant and his brother were under indictment as *conspirators,* proof that the acts of the defendant and his brother in the purchase and attempts to purchase corks were directed toward the common object of preparing for and setting the fire, was inadmissible.

"An indictment which charges an agreement or combination by inference or implication only is defective": 12 C. J., p. 616, section 190.

[4] It is, of course, possible for two persons to commit a single murder without first conspiring to do so, as the Supreme Court of the United States recognized in *Sparf and Hansen v. U. S.,* 156 U. S. 51.

a conspiracy to murder B's husband X, and B and C enter into a conspiracy to murder C's husband Y, C's declaration to a third person about crime No. 2 is not admissible against B when he is on trial for crime No. 1 (unless, of course, there is a criminal link between the crimes).

For a trial judge to stamp a certain declaration "admissible" as the declaration of a co-conspirator and at the same time to treat that declaration as proof of the conspiracy is an example of the fallacy known as petitio principii, or "begging the question"[5] If Mrs. Favata was possessed of information which involved the defendant in a conspiracy to murder both Alfonsi and Ingrao or Alfonsi alone, her testimony *from the witness stand* as to that would have been admissible. Her statement to a *third* person tending to show that she had a powerful motive to kill her husband and stepson, did not involve this defendant in a conspiracy with her to kill *her husband and stepson,* and even if it did that, it did not show that the conspiracy between her and the defendant to kill *her husband and step-son* had any legal relation with the *implied conspiracy* (if we treat this indictment as such) between the defendant and his co-indictee, Mrs. Alfonsi, to kill the *latter's* husband.

The word "conspiracy" was frequently invoked in this case to open the door for the admission of incompetent evidence, but occasionally the word "scheme" was invoked for the same purpose. Apparently the limitation in the use of the principle that "a common scheme or plan may embrace the commission of two or more crimes so related to each other that proof of one tends to establish the other" *(Com. v. Strantz,* 328 Pa. 33, 44, 195 A. 75), was not understood or heeded in the trial of

---

[5] As Judge GAWTHROP aptly said, speaking for the Superior Court, in *Com. v. Jermyn et al.,* 101 Pa. Superior Ct. 455, 472: "It is the proof and not the charge of such criminal agency that makes the declaration of a co-conspirator admissible."

this case. The *evidence* which can be so used of other crimes, *presupposes that the other crime is prima facie established by competent proof.* Justice AGNEW made that very clear in *Shaffner v. Commonwealth,* 72 Pa. 60, in which this court reversed a conviction in a capital case because the evidence received did not meet the above test of relationship to the crime charged. Justice AGNEW said: "To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burthen a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offenses charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence, it is obvious it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner. If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt. . . . It is obvious that to connect together the deaths of Sharlock and Nancy, and make the former bear upon the latter, they must have been both contemplated by the prisoner as parts of one plan in his mind, in which the taking of Sharlock's life was part of his purpose of taking the life of Nancy. He must, therefore, have contemplated the death of Nancy before tak-

ing the life of Sharlock. In order to let in the poisoning of Sharlock, the judge must have had before his mind some fact or facts exhibiting this pre-existing determination to take Nancy's life." Justice Agnew's language is specially apposite to this case.

In *Com. v. Chalfa et al.*, 313 Pa. 175, 178, 169 A. 564, this court said: "To make the evidence [of other murders and insurance] competent, it must show that a connection existed in the mind of the actor between the criminal acts, linking them for some purpose he intended to accomplish, or showing that he who committed one must have done the other: *Shaffner v. Com.*, 72 Pa. 60," (supra). In *Swan v. Com.*, 104 Pa. 218, in which two defendants were charged with burglary and robbery, this court reversed the court below for permitting testimony to be admitted against *both* defendants which we held should have been *limited to one*. This court there said: "There must be a system established between the offence on trial, and that introduced to connect it with the defendant"; they must be "mutually dependent."

It is clear that it must first be prima facie shown that the defendant on trial committed one crime before that crime can be used as evidence to prove that he committed the crime *charged* in the indictment in the case trying. In the Chalfa Case (supra) the defendants were closely connected with each murder charged against them. In each of the crimes the person murdered was an intimate member of the defendants' family, the body of each deceased had the same kind of poison in it, the defendants attended each decedent during his last illness and were present at each death and attempted to prevent the authorities from finding out anything about the deaths and to maintain secrecy thereon.

Mrs. Favata's stepson (and probably her husband) was murdered by her. Her statement to Sergeant Riccardi relating to those murders *cannot be repeated by*

*him in court to prove that the defendant[6] was guilty of the murder of an entirely different person, to wit, Ferdinand Alfonsi.* If Mrs. Favata had any knowledge of defendant's participation in the poisoning of the victim named in the indictment, she should have been sworn as a witness for examination and cross-examination. She was in court at the trial under the guard of police officials. The District Attorney has stated that the reason she had not been sentenced for the murder of her stepson, to which charge she pleaded guilty on April 21, 1939, is that "she is testifying against several others."

There is also another reason why Sergeant Riccardi's testimony was not admissible. When Mrs. Favata's statement was made to him on October 17, 1938, that statement, which was admitted on the theory that it related to a conspiracy, related only to a conspiracy *that had ended.* Its objects had been accomplished. Her husband and stepson had been murdered. Therefore, her statement was not made during the progress of the conspiracy and in furtherance of its objects. The defendant was arrested for the murder of Alfonsi on September 23, 1938. In *Wagner v. Aulenbach,* 170 Pa. 495, 499, 32 A. 1087, this court held: "The declarations of a co-conspirator are evidence against the others, only as long as the conspiracy continues; if made afterwards as were these, they are not evidence: Wharton's Law of Evidence, sections 1205, 1206, and notes." In *Sparf and Hansen v. U. S.,* 156 U. S. 51, the Supreme Court of the United States held that if two persons are indicted and tried jointly for murder, declarations of one made after the killing and in the absence of the other, tending to

---

[6] There is not sufficient proof *in this record* that she conspired *with this defendant* to murder her own husband or her stepson (though that question is not now before us). Conspiracy cannot be established by a mere suspicion nor does evidence of relationship between the parties or association show a conspiracy: *Com. v. Bardolph,* 326 Pa. 513, 521, 192 A. 916, and *Com. v. Farrar,* 97 Pa. Superior Ct. 358.

prove the guilt of both, are admissible in evidence against the one making the declarations, but not against the other. In Wigmore on Evidence, Vol. 2 (2nd ed.), p. 584, sec. 1076, it is stated: "The rule in regard to the admissions of a *co-defendant in a criminal case;* here it has always been conceded that the admission of one is receivable against himself only." Wigmore on Evidence, Vol. 4, (2nd ed.), p. 486, sec. 2100: "Confessions are not admissible against third persons." See also *Dan v. Brown,* 4 Cow. N. Y. 483, 492; *U. S. v. Ball,* 163 U. S. 662, and *State v. Newman,* 95 N. J. L. 280, 113 A. 225.

The admission of the testimony constituting the bases of the 10th, 11th, 12th and 13th assignments was prejudicial error. From beginning to end this case was tried on the theory that this defendant was charged with being a member of a *band* of murderers, though the indictment named only him and Mrs. Alfonsi. When the several jurors were examined on their voir dire they were told, inter alia, the following by the Assistant District Attorney (italics supplied): "The defendant is charged with *other defendants.* . . ." Alfonsi's "death was feloniously caused through the actions of the defendant and his *co-defendants.*" "The Commonwealth will prove . . . that the defendant, assisted by his *confederates,* not only placed insurance . . . upon his [Alfonsi's] life, . . . but *upon other persons who died in the same manner.*" The trial judge said to one of the jurors: "If a conspiracy has been proved beyond a reasonable doubt, the law holds that all involved in the conspiracy are equally responsible for the acts of each and all of the conspirators." When counsel for defendant objected, saying "this defendant is not on trial for conspiracy but murder alone," the Court replied: "Is not a conspiracy bill here?" When another juror was being examined, the Assistant District Attorney said: "The Commonwealth will allege and in the course of its trial prove by competent evidence that this defendant acted in concert with other defendants in accordance

with a preconceived plan of operation, a long time prior to the death of Alfonsi in 1938 to procure insurance upon his life, and in the course of that plan Alfonsi subsequently was administered poison and from that did die. After we have shown you that we will show you that this defendant and his co-*conspirators* in the placing of insurance on the life of Ferdinando Alfonsi was also instrumental in placing *other insurance upon other lives who received a similar death.*" To another juror the Assistant District Attorney said: "The Commonwealth will contend that Mr. Alfonsi sometime prior to his death was insured in various insurance companies, and that such insurance on his life was placed there through the coöperation of the defendant, with the wife of Ferdinando Alfonsi and his *co-confederates.*" To a special panel of jurors he said: "The Commonwealth contends that in the course of this trial the prosecution will prove that the defendant *coöperating with his associates* and by the consent of the wife of Ferdinando Alfonsi did procure insurance upon his life a long time prior to his death, and subsequently thereto did cause his death, by the administration of poison. The Commonwealth in addition to that will prove that the *defendant and his associates followed the same technique and procedure in other cases* as they did in the case of Ferdinando Alfonsi, and in the case of both Ferdinando Alfonsi *and the other persons* the motive was to get insurance money. I tell you these things now so that when you are brought up here for questioning *you will have in mind the case on trial.* . . . The Commonwealth will contend that the method of operation of the defendant and his associates both in the placing of the policies and the cause of death of Alfonsi was followed by other deaths beside that of Alfonsi."

It cannot be doubted that the jurors kept "in mind" (as the prosecutor admonished them to do) "the case on trial" *as he had pictured* it to them repeatedly. The

constant repetition[7] of the things above quoted not only at the beginning of the trial but throughout its course, must have resulted in the jury's paying little heed to the charge against the defendant *as set forth in the indictment* and in considering well the charge against defendant *as made in the several speeches above referred to (and others)*. The following excerpts from the charge of the court also tended to link the defendant and his co-indictee and Mrs. Favata in a conspiracy to commit several murders, and was therefore prejudicial:

"Take the case of Caruso. He was drowned.[8] The premiums, according to the insurance agent, were returned to this defendant, and they were returned to this defendant upon the consideration of his not making a claim. He denied they were returned. . . . You will recall the testimony, that Mrs. Favata and Mrs. Alfonsi both stated when it was suggested that the members of the family be taken to the hospital, 'We can take better care of them at home.' What did they mean? We know from the autopsies that arsenic was the cause of death, and we know that Raphael Caruso died one of the deaths that Myer and Phillips both told you were discussed as a means of getting rid of Alfonsi."

In the light of these charges the Assistant District Attorney made and repeated against defendant and "his co-confederates" and about his "placing other insurance upon other lives who received a similar death" and about him "and his associates showing the same technique and

---

[7] Le Bon in writing of "the influence of repetition" says: "This power [repetition has] is due to the fact that the repeated statement is imbedded in those profound regions of our unconscious selves in which the motives of our actions are forged. At the end of a certain time we have forgotten who is the author of the repeated assertion, and we finish by believing it." Le Bon's "The Crowd," p. 121.

[8] It should be remembered that there was in this record no proof whatever that Caruso's death was criminally caused.

procedure in other cases" and in the light of what the court said in its charge, as above set forth, the testimony whose admission is the subject of the 10th, 11th, 12th and 13th assignments of error was well·calculated to be effectively adverse to the defendant. This testimony, on this record, meets no test of admissibility and the assignments just stated are sustained.

We will now take up assignments of error 8 a to 8 h, inclusive. The subject of 8 a is the conversation between Mrs. Alfonsi (the co-indictee) and Achilles Tedesco, an insurance agent. The substance of it was that the agent told Mrs. Alfonsi that he was sent there by Paul Petrillo (defendant's cousin), and Mrs. Alfonsi said: "I want to buy some insurance on my husband but this must be a quiet case, because my husband does not believe in insurance." The agent told her that her husband would have to sign the application and she replied: "I can take care of that much." The agent later returned and the application was signed. He never saw the husband, no premium was paid and the policy was not issued. Defendant was not present at the time of this conversation.

The subject of 8 b is the statement made by Mrs. Alfonsi to George Myer that Alfonsi was very sick. The testimony is unimportant. It was admitted on the theory that (as the trial judge said) "if the Commonwealth proves conspiracy anything that was said in the presence of any conspirator is admissible."

8 c relates to a conversation between witness Blondell and the deceased, in the absence of defendant. Alfonsi complained of pains in his stomach and when the witness suggested that he go to a hospital, Mrs. Alfonsi said: "No, I think he will be better off here." Another witness, M. C. Frost, testified over objection that Alfonsi told him in the presence of Mrs. Alfonsi (but not in the presence of defendant) that "his wife objected to his going to the hospital."

8 d relates to the testimony of Dr. D'Alonzo that the deceased said to him in the presence of Mrs. Alfonsi (but in the absence of defendant) that "it seems to me as though the stomach wants to come right out just like a volcanic eruption. It is burning in there and I have a terrific lot of pain."

8 e relates to the testimony of Detective Schwartz that Alfonsi told him at the hospital, in the presence of Mrs. Alfonsi, but not in the presence of defendant, that he carried only $200 insurance and was "positive" he had no more.

8 f relates to the admission of a conversation between Anthony Franchetti, City Detective, and Mr. and Mrs. Alfonsi, in the absence of defendant. Alfonsi asked his wife: "Why did you get this insurance on me?" and she replied: "Well, I knew you did not like insurance, and you did not want any, and I wanted to get some insurance to have some protection." The witness continued: "So he says, 'How is it there was two thousand dollars when you told me I was only signing for two hundred?' So she did not give him any answer then. So then she tried to insist the insurance was taken out for protection, and he said, 'You did not take that out for my protection.' He said, 'You wanted me to die.'" The witness further testified that Alfonsi declared to the witness that he had only $200 insurance and that was in a society of which he was president. This additional conversation was testified to by the witness: "I said, 'Do you know how you were poisoned?' He said, 'I don't know how I was poisoned.' So I said, 'Where did you eat all your meals?' He says, 'I ate all my meals at home.' I says, 'Who prepared these meals?' He says, 'My wife.' . . . I said, 'Any of your food taste funny?' He said, 'At that time I did not notice'—he said—'but when I was sick I said to my wife, "Stella, you know all this stuff you bring me up—the orange juice and the foods"' he said, ' "taste funny."' And his wife, Stella, he said, replied, 'Oh, that is that medicine that makes it

seem funny—that taste—but the food is all right.' So I said, 'Did everything she bring you taste funny?' He said, 'Yes, everything she brought me had a funny taste to it.' "

The subject of assignment of error 8 g is the introduction (when John Cacopardo was on the stand) of a letter written by Paul Petrillo to Molly Starace. We have already referred to it. It was inadmissible.

Assignment 8 h relates to a conversation (already referred to early in this opinion) between Paul Petrillo, Rose Starace and Rose Carina, which took place in Brooklyn, N. Y., on December 13, 1936, in the absence of defendant. It was inadmissible.

If we treat the indictment as charging by implication the two defendants named therein with conspiracy to murder Alfonsi, the statements made by co-indictee, Stella Alfonsi, in the absence of defendant were admissible, because there *was* prima facie proof that the two defendants were in a conspiracy to murder the victim named.

However, the acquittal on October 27, 1939, of this impliedly alleged co-conspirator, Stella Alfonsi, of the charge made in this indictment, results in an anomalous situation. The testimony constituting the subjects of assignments of error 8 a, b, c, d, e, and f, was admitted by the trial judge on the theory that a conspiracy between the two co-defendants had been prima facie proved. But this prima facie proof has been negatived by the verdict of acquittal in the case against the only co-defendant named in the indictment. No rule is more firmly imbedded in the law than that "to constitute a conspiracy there must be a combination of two or more persons; one person cannot conspire with himself"; 15 C. J. S., p. 1060, sec. 37. This has been repeatedly ruled by the courts of this country and of England.

In *Com. v. Faulknier et al.*, 89 Pa. Superior Ct. 454, 459, Judge TREXLER said: "Defendant was indicted for conspiracy with Fiat and Bowman. The court granted

a new trial to Fiat and Bowman and refused a new trial to Faulknier, the defendant. This was error. If upon retrial, Fiat and Bowman were acquitted, we would have the anomoly of one person being guilty of a conspiracy without any co-conspirator. There is no allegation that there were other parties involved in the crime. In every charge of this character, it is incumbent on the Commonwealth to prove two or more guilty. 'It is enforced upon the Commonwealth in every conspiracy case, however many defendants are charged, to prove that two or more are guilty.' *Com. v. Sanderson,* 40 Pa. Superior Ct. 416." See also *Com. v. Avrach,* 110 Pa. Superior Ct. 438, 441, 2 Wharton Crim. Law (12th ed.) sec. 1657, and Bish. Crim. Law (9th ed.) sec. 801.

In *Feder et al. v. U. S.,* 257 Fed. 694, Circuit Judge HOUGH (2nd Circuit Court of Appeals) said: "The union of minds of at least two persons is a prerequisite to the commission of the crime of conspiracy." He quoted from Lord Chief Justice CAMPBELL in *Reg. v. Thompson,* 16 Q. B. 832, 117 Eng. Reprint 1100, as follows: "It is conceded that, if there be an indictment against two persons for a conspiracy the acquittal of one must invalidate the conviction of the other. . . . If three are indicted and two found not guilty the third must also be acquitted." See also *Berry v. Indiana,* 173 N. E. 705, and *Com. v. Derry* (Mass.), 108 N. E. 890 (supra).

In 5 Ruling Case Law, p. 1079, sec. 23, it is stated: "If all the defendants charged in an indictment for conspiracy are acquitted but one, unless the offense is alleged to have been committed with others unknown from the very nature of the case the verdict against that one could not be permitted to stand." See cases in accord from fifteen American jurisdictions and from Great Britain and Canada in 72 A. L. R. p. 1182.

On account of there having been prima facie proof of the conspiracy of the two co-defendants named to murder the victim named, we will not now adjudge the admission of the above recited declarations of Mrs. Al-

fonsi error, but in view of the fact that she has since been acquitted, her declarations made in the absence of defendant cannot in another trial be received as the declarations of a co-conspirator, for there is no longer a foundation for them.

It is not necessary for us now to rule on the question whether when two or more defendants are *jointly* indicted for murder, that the indictment charges by *implication* a conspiracy to commit murder, but while not ruling on that question, we have no hesitation in saying that when in such cases the Commonwealth expects to prove a conspiracy, there should be a count in the indictment charging conspiracy between the defendants named, with each other or with one another (as the case may be), and also, if the facts warrant it, "with other persons to the Grand Inquest unknown." Since in an indictment charging conspiracy "a direct averment of this fact is necessary" and "an indictment which charges an agreement or combination by inference or implication only is defective" [12 C. J. sec. 190, p. 616], it follows that a good pleader in framing an indictment for a murder resulting from a conspiracy will not rely on *implications* but will charge the conspiracy as *expressly* and *specifically* as he charged the murder.

Where a conspiracy to commit a murder is carried out there is no reason why an indictment should not contain two counts: one charging the conspiracy and one charging the consummated conspiracy, i. e., the murder itself. Standard Encyclopedia of Procedure, Vol. 5, p. 311: "Counts charging a conspiracy and the commission of an offense in pursuance thereof, may be joined where the two offenses spring out of the same transaction and the same testimony is applicable to each." (Citing cases.) It has been held proper to join statutory offense of conspiracy to commit murder and common law offense of murder *(Combs v. Com.,* 15 Ky. L. Rep. 620, 25 S. W. 276), though murder and conspiracy to commit murder

cannot be joined where the offenses spring out of separate and distinct transactions.

The 2nd, 3rd, 4th, 5th and 6th assignments of error relate to the remarks of the Assistant District Attorney and the trial judge to individual jurors and in the presence of the panel and some to the panel, about "other killings of the same nature" which the Commonwealth "will show." Many of these remarks are already quoted herein. While the Assistant District Attorney was entitled to make an opening address to the jury, his right in this respect is no greater than that of defendant's counsel. For the former to reiterate again and again the sweeping claims of the Commonwealth as to what it was going to prove against the defendant "and his confederates" and about the insurance placed "upon other persons who died in the same manner" and about the defendant's criminal responsibility for "other deaths beside that of Alfonsi," was extremely prejudicial to this defendant, and this practice, which amounted to the making of several opening speeches to the jury, we condemn and direct its discontinuance.

The 7th assignment of error relates to the query of the trial judge: "Where is the conspiracy bill? He is indicted on that," and the reply of the Assistant District Attorney: "Here is a conspiracy bill, Herman Petrillo and Stella Alfonsi and other persons presently unknown, and then the conspiracy bill of——." Defendant's counsel, Mr. Leidner, then said, inter alia: "I ask that it be noted of record that Mr. McDevitt [Assistant District Attorney] has before him various bills of indictment, six or more, on which this defendant is indicted." The Court: "There may be 106, but there has been no identification." Mr. Leidner: "He has read from some of them." The Court: "This defendant has been indicted for conspiracy, and he was arraigned on the conspiracy bill, in the presence of this jury." Mr. Leidner: "No sir, he was not. There was no jury sworn." The Court: "Let

me see the bill of indictment on which he is charged with the conspiracy. Objection overruled. Exception." Since defendant was *not* being tried on an indictment charging conspiracy by him and Stella Alfonsi *and other persons,* it was improper and prejudicial to call these bills to the attention of the panel of jurors.

The 9th assignment of error is based on the court's "permitting, over objection, other co-defendants and defendants in other cases who were not connected with the death of Ferdinando Alfonsi or the trial under this indictment to be seated in the court room within a short space of the jury box and within their full view and further erred in denying the motion to withdraw a juror." This exhibition in the presence of the jury, of other defendants obviously in custody and allegedly connected criminally with the defendant on trial though not indicted with him in the case trying, when there was no necessity for their being where they were, was improper and prejudicial. If it is necessary that defendants in other cases be identified by witnesses in the case trying, they can be brought in the court room for that purpose and taken out after the purpose is served.

The 14th assignment is based on the court's permitting testimony to be given by Dr. John A. Kolmer, an expert, as to the cause of death. He was asked: "Are you acquainted with the testimony offered by the various physicians who attended Mr. Alfonsi, Philip Ingrao, Guiseppe DiMartino and Charles Ingrao, also known as Favata?" He answered: "I am." When asked for the source of his information, he replied: "May I refer to my notes?" The court: "Go ahead." The witness then said: "In the case of Mr. Alfonsi I read the stenographic notes on the testimony offered in court by Dr. D'Alonzo and Dr. Strawbridge. In the case of Guiseppe DiMartino I read the stenographic notes of the testimony offered in the court by Dr. Massaniso. In the case of Philip Ingrao I read the testimony offered in court by Dr. Massaniso. In the case of Charles Favata I heard

the testimony offered in court this morning by Dr. Blagg." This was not the proper way to elicit an expert's opinion. Defendant had the right to know that the transcript which the witness read from was authentic and that it was read in full and carefully. The testimony on which the expert based his opinion should have been read to the witness from this record, in open court or a hypothetical question based on it should have been put to him. The method used was loose and irregular and opened the door to grave abuses. This assignment of error and assignments of error 2, 3, 4, 5, 7, 8 g and 8 h are sustained.

The 16th assignment is based upon the court's instructions as to circumstantial evidence, appellant's counsel stating that these instructions were "involved, intricate and misleading." While we find no erroneous statement as to the law in these instructions, they are deficient in clarity. Trial judges when giving instructions on circumstantial evidence should do so in the language of laymen rather than in the language of legal experts, so that the jury may be helped in their deliberations.

The 18th assignment is based on the court's refusal to arrest judgment. The motion for arrested judgment is based on the fact that the jury returned a verdict as follows: "Guilty of murder in the first degree and recommendation of death." The Act of May 14, 1925, P. L. 759, sec. 1, provides that in cases of persons convicted of the crime of murder in the first degree, "the jury trying the case . . . shall fix the penalty by its verdict," and "the court shall impose the sentence so fixed, as in other cases." It is obvious, of course, that a "recommendation of death" is not a *fixing* of the death penalty, but after the jury was polled the crier said: "Members of the Jury, Hearken to your verdict as the court has recorded it. You say you find the defendant, Herman Petrillo, guilty of murder in the first degree, and fix the punishment at death, in the manner provided by law, and so say you all." In our judgment, this action of the crier

in the presence of the court and the jury's assent to what he said cures the irregularity in the rendering of the verdict. The 18th assignment of error is therefore overruled.

There are other assignments of error which it is not necessary to discuss. Appellant's counsel complains that the trial was conducted in a manner prejudicial to the prisoner's rights and not in accordance with Anglo-Saxon and American traditions of due and orderly process of law. For example, counsel calls attention to an episode in the trial when defendant said to an insurance company employee named Domenick Corigliano, when the latter was on the stand: "What a lie! Why don't you tell the truth?" Whereupon the Assistant District Attorney said: "Shut up," and the court said: "Let him rave."

The language just quoted is not in keeping with that "orderly proceeding adapted to the nature of the case," which this court said in *Com. v. O'Keefe,* 298 Pa. 169, 172, 148 A. 73, was a part of that "due process of law" which in this country is a traditional safeguard of an accused. In *Powell v. Alabama,* 287 U. S. 45, 55, the Supreme Court of the United States, in an opinion by Mr. Justice SUTHERLAND, declared that trials for felonies such as charged in this indictment should proceed "in the calm spirit of regulated justice."

The trial under review arose out of what the newspapers called the "arsenic ring murders" in Philadelphia. There is no other case which calls for such strict impartiality on the part of a trial judge and such fearless adherence by him to these "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" *(Hebert v. Louisiana,* 272 U. S. 312, 316) as those cases which have been sensationalized in the public press. In all such cases there is much public *prejudgment* and this is always adverse to *any* of those at whom the finger of accusation points. Anyone mentioned as *in any way connected* with those

accused is in the public mind already condemned.[9]  No trial judge should permit his judgment and sense of good taste to be warped because of his official participation in a "front page" case.[10]

When in any criminal trial the Commonwealth is attempting, as it did here, to fasten guilt on *many* individuals (whether indicted or not), there is always danger of the jury's seeing in the blur of protracted testimony the criminal enmeshing of certain persons whose *association* with others *may be* entirely *consistent with innocence,* and to forget that one accused of conspiracy is entitled to an acquittal if unlawful collusion is *not the only reasonable interpretation* of which facts concerning him are susceptible. (*Com. v. Bardolph,* supra.)  In a trial as lengthy as this and with the multiplicity of names mentioned in a 1222 page record, it is easy to confuse testimony which involves only A as involving B.  (For example, in reviewing this evidence as a whole one must be on guard lest he confuse direct testimony against *Paul* Petrillo as being against defendant, *Herman* Petrillo.)  In *McElroy v. U. S.,* 164

---

[9] As was the case of some innocent persons at first condemned for the murder of Abraham Lincoln because of their association with Booth.

[10] Judge Cox in the trial of Charles J. Guiteau for the murder of James A. Garfield, began his charge by quoting those constitutional provisions which he characterized as the "indispensable safeguards of life and liberty," and then said: "They are intended for the protection of the innocent from injustice and oppression. It is only by their faithful observance that guilt or innocence can be fairly ascertained.  Every accused person is presumed innocent until the accusation be proved, and until such proof no court dares to prejudice his cause or withhold from him the protection of this fundamental law." Judge TRUMAN C. WHITE, who presided at the trial of the murderer of William McKinley, complimented opposing counsel on the fact that they had "made no attempt to unfairly secure a verdict one way or the other," and he declared that the spirit which had characterized the trial and *should* characterize it *until the end* was the spirit of "a genuine, a tender and a reverent solicitude for the dignity and majesty of the law."

U. S. 76, the Supreme Court of the United States, in an opinion by Chief Justice FULLER, said: "In cases of felony, the multiplication of distinct charges has been considered objectionable as tending to confound the ac-cused in his defense, . . . in the distraction of the at-tention of the jury, or otherwise. . . ." Justice PIERCE BUTLER once referred to the danger of trying individuals *"en masse* . . . the danger of mistake and injustice that inevitably attends an attempt in a single trial to ascertain the guilt or innocence of many accused."[11] In a trial in which *several persons* (whether indicted or not) are *charged* with being in a confederacy of crime, it cannot be expected that a jury will carefully discrim-inate between evidence which implicates an individual and evidence which is consistent with his innocence. This court has often pointed out, as it did in an opinion by Mr. Justice KEPHART in *Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390: "The evidence [of an unlawful com-bination] must be such as to exclude to a moral cer-tainty, every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence." We reiterated this in *Com. v. Bardolph,* 326 Pa. 513, 521, 192 A. 916 (supra). Unless the evidence which links a defendant on trial to another crime, or links another person to the crime charged in the indictment, meets the standard thus laid down by this court, the trial judge should not let the jury *conjecture* as to the guilt of the person to whom the evidence relates. For example, the mere fact that the defendant asked a friend or acquaint-ance of his why the insurance on DiMartino was not paid, does not establish to a moral certainty that he helped murder *DiMartino,* nor does the fact that he was

---

[11] Dissenting opinion in *Powell v. Alabama* (supra), 287 U. S. 73, 74.

seen in Mrs. Favata's home in 1938 establish the fact that he helped murder her husband in 1935.

The law confers on no judge the power of *pre*judgment. A defendant charged with crime is not likely to receive a fair and impartial trial, if the judge from the beginning exhibits an attitude which conveys to the jury the impression: "Here is a man guilty of an atrocious murder but of course we have got to go through the *form of a trial* before we send him to the electric chair."[12]

In ordering a new trial in this case we are not holding that there was not sufficient competent evidence offered to warrant a conviction, but we *are* holding that there was such an admixture of competent and *in*competent evidence in the testimony admitted as to deprive the defendant of the fair and impartial trial which every accused in an *American* court of justice is entitled to. It is the duty of the appellate courts to see to it that *every defendant* gets such a trial. This court said in *Logue v. The Commonwealth,* 38 Pa. 265, 269, in an opinion by Justice THOMPSON: "It was suggested on the argument here, that even if there was error in the particulars discussed, it did the prisoner no harm, as the jury found him to be guilty of a wilful, deliberate, and premeditated murder, and therefore the law of self-defense could have no application to his case. This suggestion is more plausible than sound. It would be very unsafe to prove the accuracy of all the steps in a trial by the result of the verdict. Who can tell what the result might be in any given case where there is error in some of its parts? The result might be accurate, but it would probably be accidental. The law does not conclude parties and rights upon such uncertain grounds. Its utmost effort is accuracy, as far as it may be at-

---

[12] It is narrated that in the early days of California a judge said to a mob intent on taking a prisoner's life: "Well, boys, let's give him a trial and *then* lynch him."

tained through fallible agencies, and then its mission is complete, and its conclusions irrevocable."

Both the ninth section of the Bill of Rights of the Constitution of this Commonwealth and the first section of the Fourteenth Amendment to the Constitution of the United States guarantee, in substance, to one accused of crime not only the forms but also the *fundamentals* of a fair trial. Of many of these fundamentals, this appellant was deprived.

The judgment is reversed and a new trial is ordered.

Mr. Justice DREW and Mr. Justice LINN concur in the result.