## STATE v. HARRIES.

No. 7273. Decided August 19, 1950. (221 P.2d 605.)

See 22 C. J. S., Criminal Law, Sec. 812. Proof of bribery where elements constituting crime are shown, 158 A. L. R., 316.    See, also, 8 Am. Jur. 887.

*Arthur Woolley,* Ogden for appellant.

*Brigham E. Roberts,* Dist. Atty., Salt Lake City, *Clinton D. Vernon,* Att. Gen., *A. John Brennan,* Asst. Atty. Gen., for respondent.

LATIMER, Justice.

The defendant, Robert S. Harries, who was Chief of the Enforcement Division of the Utah Liquor Control Commission, was charged by indictment with the crime of receiving a bribe. He was found guilty as charged and appeals from the judgment of conviction. His assignments of error or statement of points will be referred to later.

Section 103—26—4, U. C. A. 1943, defines the offense as follows:

"Every executive officer, or person elected or appointed to an executive office, who asks, receives or agrees to receive any bribe, upon any agreement or understanding that his vote, opinion or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby, is guilty of felony."

Omitting the formal parts of the indictment, the elements of the crime were alleged in the following language: "That the said Robert S. Harries, on or about the 1st day of December, 1946, at the County of Salt Lake, State of Utah, he being then and there an executive officer and a person appointed to an executive office, to-wit: the Chief of the Enforcement Division of the Utah Liquor Control Commission, received a bribe, to-wit, money, from Cyrus Lack upon an agreement or understanding that his action upon a matter which might be brought before him in his official capacity would be influenced thereby, to-wit: upon an agreement and understanding that he, the said Robert S. Harries, would permit and allow Robert Osanna to conduct and operate the Railroad Club at Helper, Utah, in violation of the Liquor Control Act, that is, to permit and allow said Robert Osanna to maintain a building and rooms where alcoholic beverages were to be sold, kept, bartered, and

stored in violation of the Liquor Control Act, and where persons would resort for the drinking of alcoholic beverages."

The evidence covers 814 typewritten pages, so it is impracticable to do more than refer to the important details. The general plan or scheme under which the defendant and one Cyrus V. Lack operated will be pictured from the testimony given by Lack and Ossana and the evidence which the trial judge concluded was necessary to corroborate their testimony must be found in the testimony given by other witnesses.

Mr. Lack testified that he and a partner acquired the Brigham Street Pharmacy, located in Salt Lake City, Utah, in the year 1945 and operated it up to and including March 2, 1948; that at the time of the purchase, the partnership commenced to operate a liquor package agency for the Utah State Liquor Commission, but some 90 days later he took over the operations of the agency personally and continued to operate it up to and including the time it was closed by action of the Commission; that in 1946, during the months of April and May, he had a number of conversations with the defendant Harries concerning the latter's candidacy for sheriff of Salt Lake County; that in one of the first conversations, in the presence of a group of friends, Harries stated that he was running for sheriff with good chances to be elected and that the people who were willing to help him would not lose as he would be either sheriff of Salt Lake County or Chief Enforcement officer of the Liquor Commission, and in either event he could repay them for their efforts; that during this period Lack had a number of conversations with the defendant relative to operating a scheme which, in substance, was that Lack would sell whiskey to selected club owners operating in the state at a price considerably above the Commission's price and Harries would afford them protection from arrest; that the profits would be divided on an equal

basis between Harries and Lack, after deducting the costs of delivery; that it was understood that before Lack sold any whiskey to any club, he would clear with Harries and the latter would be notified before delivery was made; that it was further understood that Harries would inform Lack if it became necessary to raid any of the clubs and that Lack could in turn notify the operator of the club to be raided.

Continuing, Lack further testified that in June of 1946 he became acquainted with Robert Ossana who was desirous of opening a club in Helper, Utah; that Ossana requested his assistance in obtaining whiskey to sell over the bar of his club; that he informed Ossana it would be a couple of days before he could definitely commit himself; that he then contacted Harries, telling him the substance of this conversation with Ossana; that it was agreed between them that Ossana was to be given the privilege of buying the whiskey for sale in Helper, provided he paid a bonus of $15.00 per case; that Harries was to notify Lack if any raids were to be made by agents of the Liquor Commission so that he in turn could notify Ossana; that Lack informed Ossana of the substance of his conversation with Harries; that he sold Ossana 30 to 35 cases of whiskey and charged him the bonus of $15.00 per case, half of which was turned over to Harries; that in either November or December, 1946, Osana made another purchase of 30 to 35 cases of whiskey and the same bonus was exacted and the same division made with Harries; that as Lack was paying Harries his portion of the money received from the November sale, Mr. Young, an employee of the pharmacy, came in and observed the money being divided; that in the latter part of 1946, Harries informed Lack that an employee of the Liquor Commission was going to Helper, Utah to do some undercover work, and that Lack was to inform Ossana the man would be attempting to make purchases and would be dressed in a hunting suit; that he conveyed this informa-

tion to Ossana but the plan did not work out as anticipated as the agent succeeded in making a purchase from Ossana's club; that he told Harries of the incident and Harries became "raving mad" as Ossana's club was the only place in Helper where the agent was able to make a purchase of whiskey; that in 1947 Ossana purchased additional whiskey and Lack called one Ulysses Hatsis to come up and assist in the loading; that while the whiskey was being loaded Harries came in and stood in the front part of the store; that Lack notified Hatsis that he would be paid by Harries for his services and so Hatsis walked up to Harries, who paid him $20.00 for his help; that during the month of September, 1947, Harries informed Lack the Commission was receiving a lot of threatening letters from Carbon County and the people in that vicinity believed the Commission was giving Ossana preference; that Harries directed him to notify Ossana that a raid was to take place, that Ossana would have to be shut down for a short while, and that he would have to take a fine of $50.00 to $100.00.

The evidence which has been related deals with the plan or scheme and the passing of money between Ossana, Lack and Harries. The remaining portions of Lack's testimony portray the method of operation used by him and Harries in connection with the other clubs and in connection with the financial transactions between them.

Lack's testimony on these other transactions is substantially as follows: That in 1946 he had a conversation with the manager of the Fort Douglas Golf Club in which the sale of whiskey was discussed and he informed the manager that whiskey could be purchased through him in case lots, if a $15.00 per case bonus was paid; that whiskey was sold to the club and the bonus divided with Harries; that in the same year he had a conversation with a representative of the Elk's Club in Ogden about the sale and purchase of liquor at a premium price of $10.00 per case; that sales were made and the money received from the sales was divid-

ed between the two; that in connection with the sale to the Elk's Club in Ogden it was necessary to employ a driver, and a Mr. E. L. Jensen delivered the first load of whiskey to Ogden, for which he was paid the sum of $50.00; that payment to Jensen for his services was made in the presence of Mr. Harries; that in 1946, Lack became acquainted with Mr. Lee Williams, who operated the Country Club at Price, Utah; that it was concluded between Harries and Lack to permit Williams to purchase whiskey; that in August of 1947 Harries informed Lack that an agent by the name of Heath was being sent to Helper, Utah, to purchase drinks from a nonparticipating club (Diamanti's) and that Ossana and Williams should be alerted that the agent would be there; that in spite of the warning, the agent slipped in and purchased liquor from both Williams and Ossana; that the agent reported the purchase to Harries who, in turn, notified Lack that the boys had been careless in permitting the purchase, but that the agent would be fired for his activities; that in 1947 he met Tony Nickas from Price, Utah, and he, Nickas and Harries had a conversation in the back of the drug store concerning the purchase of whiskey; that Nickas made two payments to Lack, one of $200.00 and one of $100.00, which were turned over to Harries; that Harries and Nickas, in Lack's presence, discussed the operation of the proposed club and Harries cautioned Nickas to be careful and not to become too ambitious; that in all instances when sales of whiskey were made, Harris was paid his 50 percent interest; and that some of the money paid to Harries was delivered by leaving sealed envelopes with the employees in the pharmacy with instructions to deliver the envelopes to Harries.

Mr. Ossana testified that he was a resident of Helper, Utah; that he had heard some talk about being able to purchase liquor at the Brigham Street Pharmacy; that he drove to Salt Lake City in June of 1946 where he introduced himself to Lack; that Lack was not very communicative at

that time and told him to come back in a week or ten days; that he came back as agreed upon, discussed the matter with Lack, who told him a sale could be made; that he purchased 30 to 35 cases at that time and paid a bonus of from $12.00 to $15.00 per case; and that his car was loaded late in the evening at the Brigham Street Pharmacy; that Lack informed him that just so long as he dealt with him, Ossana would be notified of any contemplated raids; that subsequently Lack called Ossana on the phone and told him there would be an agent in Helper dressed as a sailor and for Ossana to look out for him; that in accordance with this information, an undercover agent appeared in Helper dressed as described; that in November, 1946, approximately six months later, he made another purchase of approximately 30 cases of whiskey and paid the same premium price; that in December, 1946, Lack called Ossana and told him that a Mr. London, a Liquor Control Agent, was going to work in Carbon County and he would be dressed in a hunter's coat and high boots; that in keeping with this information, London appeared in Carbon County dressed as described by Lack; that in spite of the warning, the agent got in the club and made a purchase of whiskey; that Ossana made a trip to Salt Lake to inform Lack of the purchase, and Lack replied that he would get Ossana off as easy as possible, probably for $100.00; that a few days later the city marshall charged Joe Myers, a partner in the venture, with the sale of whiskey; that Myers went up to the city court, pleaded guilty, and paid a $100.00 fine; that the premises were not closed and the club continued operation; that in 1947, by the use of a membership card, State enforcement officers got into the club, sales were made to them, but their identity was discovered prior to their departure from the club; that Ossana discussed this matter with Lack, complaining about his lack of protection and was told that something would be done about that incident; that no arrest was ever made and the method of

operation continued the same; that in August of 1947, Ossana purchased approximately 22 cases of whiskey and there was present at that time, a Mr. Hatsis, who assisted in loading the whiskey; that in a conversation in the office of the Chi Chi Club in Salt Lake City, Lack informed Ossana there had been too many complaints from Carbon County about his club operating and the rest of them being knocked over, and that Ossana must submit to a raid; that Ossana was shown a letter by Lack which purportedly came to the Liquor Commission from Carbon County; that thereafter Ossana met Harries on the street in Price, at which time Harries told him he was going to knock him over; that Harries said that things were getting too hot down there; that he saw Harries the next night in Price in company with the Nickas brothers and that at that time Harries told Ossana that he would have to quit buying from Lack as Lack was through; that the next time he saw Harries was the 4th or 5th of October at Harries' home in Salt Lake City; that Harries again notified him that it would be necessary to knock him over; that the next day at the New Grand Hotel, Harries again discussed raiding Ossana's club and Ossana replied that he could not afford to be implicated as he already had one liquor arrest; that Harries countered by saying it would not be necessary, "We will take the bar tender;" that in the same conversation Harries informed Ossana that two women were being sent down to raid the clubs; that the dates would be the 7th, 9th and 14th of October, 1947, and that Harries was going to make the main raid on the 15th. That Ossana again saw Harries on Columbus Day in Salt Lake City; that Ossana and Tony Nickas went out to Harries' home and there Harries told them they would be doing him a big favor if they would go with him to the Governor's office, which they did; that on the 7th day of October, the two women appeared in Helper and Ossana stood on the street a little way from the entrance to his club and watched;

that the two women came staggering along the street and attempted to get in the place; that the bar tender refused to admit them but he called Ossana who cleared their admittance; that on the 14th of October, Ossana saw Harries in an automobile outside the Travellers Motor Lodge in Price; that Ossana and Nickas got in the car and Harries told Ossana he would have to make his raid that night; that Ossana replied he needed one hour to get some materials and papers out of the club and Harries assured him that would be all right; that the raid was made and the bartender arrested.

The evidence detailed above pictures rather clearly a violation of the bribery section of the code, but in view of the instructions submitted to the jury, it becomes important to determine whether there is evidence, aside from the testimony of Lack and Ossana, which connects the defendant with the crime.

Mr. John W. Young testified that he was a resident of Salt Lake City and became acquainted with Lack in 1945; that he worked as a clerk in the package agency department of the Brigham Street Pharmacy; that in 1946 Harries and Lack were present in the drug store while the witness was opening up the liquor department, and at that time Lack introduced him to Harries; that at a later date around Thanksgiving Day of the year 1946, he went to the rear of the store to get a drink and saw Lack standing by Harries counting out money, that Harries stated, "Cy, we can make some money on this deal."

Mr. Jose Perez was the temporary lessee of Ossana and Myers. His testimony deals with signing the lease around October 1, 1947, the admission of the two women to the club; the details of the raid on Ossana's Club on the 14th of October, 1947, the efforts made to remove the papers and cash from the club prior to the raid and the subsequent court proceedings.

Mr. A. W. Nickas testified that he lived at Price, Utah, and operated a tavern known as Tony's Club; that he became acquainted with Lack in the spring of 1947; that in June of that year he had a conversation with Lack relative to obtaining whiskey for his club in Price, Utah; that Lack stated he would contact Harries and notify him whether or not a deal could be worked out; that in the month of July he had another conversation with Mr. Lack in which he was assured that he could operate a club and he gave Lack $100.00; that Lack called Harries on the phone and shortly thereafter Harries appeared and he was introduced to the witness; that Lack told Harries he was planning on opening a club in Price; that Harries and Lack left, went into an adjoining room, and in a few minutes both returned; that in the presence of Harries, Lack assured him that everything was arranged and Harries said, "I want you to have your lockers on your premises in the club, and be careful"; that Nickas saw Harries at his home on several occasions and in the month of August he met Harries near the liquor warehouse in Salt Lake City; that in a conversation there Harries requested that Nickas and his brother assist in getting an agent in to Diamanti's Club; that Harries sent an agent by the name of Heath down to obtain entrance to the club; that his Club was closed during the time Heath was working in that area; that he talked with Harries twice within a week or ten days after the Diamanti raid and in a phone conversation asked Harries if he might re-open his club and was told that things were too hot and it could not be re-opened; however, Harries promised to advise as to an opening date; that in a second conversation about a week later, a second request to re-open was made and the same answer given; that on the day the Diamanti trial opened, Nickas saw Harries in the Price Athletic Club and there were present the sheriff of Carbon County, Miss Gayle Cassity, two brothers of the witness and the witness; that Harries asked the witness to identify Lack to the

sheriff; that Harries said that he was not fooling when he made the request, that he wanted the witness to tell who Lack was, as Lack was through and the witness was no longer to operate with him; that the next day the witness saw Harries at the Mission Auto Court and after trying to get out of testifying against Diamanti, he told Harries that his brother and wife would testify, but since they had spent so much money in remodeling the club, they should be permitted to operate and get the expenditure back; that Harries asked him how long it would take to get even, and they notified him six to seven months; that in October of 1947, the witness made a trip to Salt Lake City with his brother and Ossana and they proceeded to Harries' residence; that on the next day in a New Grand Hotel room, in the presence of the witness and Ossana, Harries told Ossana that because of public sentiment and the letters received he, Ossana, would have to take a knock-over; that Harries designated the days that he would send two ladies down to make the purchases of liquor; that Ossana told Harries he did not want to be charged with the violation as he had a previous record; that Harries informed Ossana that he could hire a bar tender and the bar tender would be arrested and held responsible; that Harries further stated that he believed the fine would be $100.00 and that the fixtures could be bought back for between $50 and $100.00; that on the 12th of October the witness met Harries in his club in Price; that Harries said everything was all right, that he had taken care of Lack and that he had an appointment with the Governor the following morning; that the next morning the witness was advised by his brother John that he and Ossana must proceed to Salt Lake City to meet with Harries and that it would be necessary for them to be there by eleven o'clock; that they arrived at Harries' residence about that time and Harries requested that they go with him to see the Governor; that on the way up he

informed the witness as to what he wanted them to say; that they met with the Governor and conveyed the message as requested, and returned to Harries' home, where a further discussion was had concerning the raids to be made on Ossana's club; that the following night the witness saw Harries in one of the clubs in Price, Utah, and Harries informed the witness that he must contact Ossana, that the plans had been changed and for Ossana and the witness to meet Harries at the Travelers Auto Court; that the message was conveyed to Ossana and the two of them drove to the motor lodge, where they met Harries; that Harries informed Ossana that it was necessary that the raid be made that very evening, and Ossana requested that Harries give him at least an hour to clean up his place; that Harries agreed to a delay for that length of time; that the watches were synchronized and the witness and Ossana left; that later that evening the witness met with Harries and his secretary in the Price Athletic Club and was notified that Ossana's place had been raided.

Mr. A. E. Williams testified that he was a resident of Price, Utah, that in the early part of June, 1947, he became acquainted with Lack; that he was manager of the Country Club at Price, Utah; that he discussed the purchase of whiskey with Lack and the question of protection; that he was informed by Lack that if he purchased his liquor through Lack and got into any trouble, he and Harries would get him out of it, and that if it got too hot in Price, they would notify Ossana who would in turn notify him; that he received a call from Lack in July and in the conversation Lack accused him of being careless for having sold a drink to an inspector of the Liquor Commission; that he was directed by Lack to get in to Salt Lake and discuss the matter with Lack just as soon as he could get there; that in the conversation in the pharmacy Lack again told the witness a state man had purchased some drinks and Williams replied that he

thought he was being protected; that in replying, Lack stated the undercover agent was not supposed to go to the Country Club or the Railroad Club because he had been sent there for the sole purpose of making a purchase from Diamanti's; that the agent became a little too ambitious and made purchases from the wrong people; that Lack further stated that the agent's name was Heath and that in a few days he would be called back to Salt Lake City and fired; that Williams was never arrested nor charged with any liquor violation as a result of this sale.

Ulysses Hatsis testified that he was a resident of Salt Lake City, Utah, and that he was engaged in the night club business; that he met Harries during May or June of 1946; that in 1947 he was called on the phone by Lack and requested to go to the Brigham Street Pharmacy to help out; that he arrived there about 10:30 in the evening where he met Ossana and Myers; that later on that evening Lack asked him if he would help load some whiskey for Ossana, which he did; that after finishing, Lack stated that Harries would take care of him; that Harries was standing in the front part of the store and as the witness was approaching Harries, Lack hollered, "Take care of Duke, Bob, he well earned it. Give him $20.00"; that Harries paid the witness $20.00; that in the early part of September at the request of Lack, the witness loaded a car with ten cases of whiskey at about 11:00 o'clock in the morning; that while loading the car Harries was on the sidewalk some 20 to 30 feet away from where the liquor was being loaded; that after the loading was completed, he went into the store and Lack and Harries were in conversation; that at that time and in the presence of Harries, Lack gave the witness further instructions concerning the delivery of the whiskey.

Mr. Edwin F. Heath testified that he was an undercover agent for the Liquor Control Commission; that on or about the 23rd of August, 1947, he was sent by Harries

to Carbon County for the express purpose of getting evidence on Diamanti's Club; that Diamanti's was the only club in which Harries expressed any interest; that after making certain acquaintances he was able to get into the Country Club in Price, where he purchased some drinks, and he also got in and purchased drinks in Ossana's Railroad Club in Helper; that he was unable to get into the Diamanti Club prior to the time it was raided; that he ran into Harries, who was then in Price, and the latter directed him to return to Salt Lake City; that he made a full report to Harries of purchases in the Railroad Club and the Country Club, but no prosecution ever resulted, and in about ten days time he was fired.

Mr. Jay W. London testified that he was employed by the Utah Liquor Control Commission, Enforcement Division; that on the 23rd day of November, 1946, he was sent to Carbon Country in connection with his duties as an inspector; that he was dressed in a hunting outfit; that he was able to get in the Railroad Club and make some purchases of whiskey; that he was admitted by Joe Myers, who made the sales on that occasion; that on a second occasion he purchased liquor from a bar tender who was unknown to him; that Myers was charged with the sale, but abatement proceedings were not instituted, and no charge was filed against the man making the second sale.

Mrs. Herman F. Lund testified that she is a housewife who had been employed by the Brigham Street Pharmacy; that during 1946 she frequently saw Mr. Harries in the store; that on two occasions during the months of May or June she delivered two sealed envelopes to Mr. Harries under the following circumstances: The first was given to her by Lack with the request that she put it in the safe and when Harries came in the store, to give it to him personally; that Harries later came in and she delivered the envelope; that the second time, at Lack's

direction, she placed the envelope in the cash register and delivered it to Harries upon his arrival in the evening.

Eldon L. Jensen testified that he knew the defendant and had known him for quite a number of years; that he knew Lack and had seen Harries in Lack's place of business on a number of occasions during the years 1946, 1947, and 1948; that during the latter part of 1946 at Lack's request, he made a delivery of whiskey to the Elks Club in Ogden, Utah; that a few days after the delivery, he was paid $50.00 in the presence of Harries for his services; that when he walked into the pharmacy and back into the prescription department, as he went through a door, he saw Lack handing Harries some money.

There were many other witnesses called to testify against the defendant. Their evidence was in part cumulative and in part for the purpose of filling in the interstices to complete the overall scheme. In addition their evidence established the extent and scope of the operations. These witnesses testified to their dealings with Lack, the arrangements as finally completed, the amount of money paid for the whiskey purchased, and, the contacts or lack of contacts with the defendant. For the most part, they represented other clubs purchasing from Lack.

To show the scope of the operation, we have roughly computed the sales made to only three of the clubs involved. During a period of approximately 8 months in 1946, three clubs paid Lack at least $35,000 for whiskey. Sales to other clubs were correspondingly large. The transactions were completed and deliveries made during the time rationing was in effect in this state and some of the deliveries reached as high as 100 cases. While almost every permit holder in the state was having difficulty obtaining a small amount of liquor, Lack was able to carry on extensive operations with the people and clubs involved without molestation or arrest. That he could

operate and carry on such a large volume of business from a small package agency in such a notorious manner suggests either participation by some one in the Enforcement Division or unequalled laxity in upholding the law.

Appellant in seeking a reversal, has assigned some forty-two alleged errors. These have been grouped into seven points, for the purpose of argument. These points are that the trial court erred in the following particulars: (1) Denying to the accused the right to inspect and make a copy of the transcript of the testimony of the witnesses appearing before the Grand Jury; (2) denying to the accused a continuation of the trial until after inspection of the stenographic notes; (3) requiring the defendant to stand trial during a period of political activity; (4) erroneously ruling upon matters of evidence; (5) denying a motion and request for a directed verdict of not guilty; (6) giving erroneous instructions and refusing to give correct requests; (7) denying defendant's motion for a new trial.

We consolidate points (1) and (2). On July 10, 1948, counsel for the State and defendant stipulated the case could be set for trial on September 13, 1948. Immediately preceding the commencement of the trial on that date, the defendant filed and presented to the court an affidavit and motion for continuance of the case. There was incorporated in the motion a request for an order of the court to permit defendant to inspect and make a record of the testimony given by the witnesses appearing before the Grand Jury. The court denied the motion to inspect the transcript, but permitted the defendant to make use of the same for the purpose of cross-examination. The court likewise denied defendant's motion for a continuance. There was no error in the ruling on the motion to continue the hearing as the motion is without merit

since we hold the defendant is not entitled to inspect a copy of the transcript before trial as a matter of right.

Under Section 105—19—9, U. C. A. 1943, as amended by Chapter 13, Laws of Utah 1947, evidence given by witnesses before the Grand Jury is transcribed and two typewritten copies are prepared. One is filed in the office of the county clerk and one is given to the district attorney, except under circumstances not material here. This section of the statute, together with the next succeeding section, prescribes a limitation on the use of the transcript or a disclosure of its contents. Chapter 13, Laws of Utah, 1947, Section 105—19—9, erroneously printed 105—19—1, contains the following language:

"No person to whom a transcript of the testimony has been delivered as herein provided shall exhibit said transcript to any person, or divulge the contents thereof to any person except upon written order of the Court, duly made after hearing the persons in whose custody said copy is placed; except that said *testimony so transcribed may be used by the prosecuting attorney to impeach the testimony of any witness appearing at the trial of a person indicted by the Grand Jury*, or of a person accused of and being tried for perjury." (Emphasis added.)

Section 105—19—10, of the same chapter, Laws of Utah 1947, provides in part as follows:

"Any grand juror or other person may, however, be required by any court to disclose the testimony of a witness examined before the Grand Jury, *for the purpose of ascertaining whether it is consistent with that given by the witness before the Court*."_ (Emphasis added.)

It has always been the policy of the law that the investigations and deliberations of a Grand Jury should be behind closed doors and that the results of its labors should not be disclosed. The principal purpose of keeping secret the proceedings of the Grand Jury are as stated in Volume 24, American Jurisprudence, Para. 47, Page 865:

"The policy is to inspire the jurors with a confidence of security in the discharge of their responsible duties, so that they may deliberate and decide without apprehension of any detriment from an accused or any other person; to secure the utmost freedom of disclosure of alleged crimes and offenses by prosecutors; to conceal the fact that an indictment is

found against a party, in order to avoid the danger that he may escape and elude arrest upon it before the presentment is made; to prevent perjury and subornation of perjury by withholding the knowledge of facts testified to before the Grand Jury, which, if known, would be for the interest of the accused or his confederates to attempt to disprove by procuring false testimony; and also to save the citizen the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge, unless there is sufficient cause for it."

The purposes of the law are largely accomplished, insofar as concerns the secrecy of testimony, after the indictment has been found, the accused taken into custody, and the Grand Jury finally discharged. There is no good reason why the testimony of a witness should not be disclosed whenever it becomes necessary to the proper and efficient administration of justice. If the rule were otherwise, witnesses before the Grand Jury would be tempted to commit perjury without fear of punishment.

The common laws rules concerning secrecy were strict and inflexible, but over the years a policy of liberation developed. By enacting Chapter 13, Laws of Utah 1947, supra, our legislature evidenced an intent to release some of the tightly bound rules of secrecy. However, we cannot go further than permitted by the provisions of this chapter for the reason that the authority to relax is with the legislature and not the courts. The quoted sections establish that the legislature only intended to lessen the tension of the common law rules to the extent of making a transcript available to the defense for impeachment purposes. While it is true the legislature gave the state access to the transcript at an early date by requiring a copy to be filed with the prosecuting attorney, this is not an infringement on a right of the defendant for the reason that the District Attorney is present in the Grand Jury room and has knowledge of the evidence given by the witnesses. Furthermore, the legislature could have very easily prescribed that a copy of the transcript be furnished the defendant, had it intended such to be the case.

Not having done so the defendant must found his rights on Section 105—19—10, Chapter 13, Laws of Utah 1947, supra. Under the provisions of that section, the matter is left to the sound discretion of the trial court and the burden to establish an abuse of that discretion is upon the defendant. The transcript was inspected by counsel for the defendant so the only question is: Was the permitted inspection too late for the purposes contemplated by the statute? If use of the transcript is limited to impeachment purposes, then defendant could not make a claim of contradictory stories until a witness who had appeared before the Grand Jury had testified in the trial of the cause. Until that time there could be no showing made that there were variances in the testimony of any witness on the two occasions. In the present action there was nothing disclosed to the trial judge prior to the time the trial commenced which would require him to exercise his discretion in favor of the defendant. When the witness Lack completed his direct examination and cross-examination suggested uncertainty in his testimony, the transcript was made available to the defendant. The trial judge exercised his discretion in an appropriate manner and this assignment fails.

We overrule defendant's contention that the court abused its discretion in proceeding with the trial during a period of political activity. As previously indicated, on July 10, 1948, the parties stipulated that the case might be tried on September 13, 1948. The defendant was aware of the date of election and knew there would be considerable publicity over the operations of the Liquor Control Commission, and its Enforcement Division. Efforts were not made to change the time of trial until the day set and then the reasons assigned by defendant were indefinite and general. The affidavit was couched in broad generalities and assigns no particular reason as to why defendant could not have a fair and impartial trial. There

was some veiled reference to a political campaign and to circumstances which defendant claims were agitating the minds of the people in connection with the election of the Governor of the state. However, there were no concrete facts alleged to justify the conclusion that an impartial jury could not be obtained. The motion was not argued and the showing made was not sufficient for us to say the trial judge abused his discretion in ruling as he did.

Points (4) and (5), (6) and (7) can be discussed together for the reason that they raise substantially the two propositions: First, was the defendant convicted by the uncorroborated testimony of an accomplice and second, was the evidence of other crimes improperly received?

A discussion of whether the state witnesses, Lack and Ossana, were accomplices is unnecessary as the trial judge concluded they were and so instructed the jury. Accordingly, we shall treat his instructions to this effect as the law of the case and point out why we believe the evidence corroborative of the three statutory elements; namely, (1) That Harries was an executive officer of the State; (2) that he solicited, received or agreed to receive, a bribe; (3) that there was an agreement and understanding that his official action would be influenced by the payment received.

In *State v. Laris*, 78 Utah 183, 2 P. 2d 243, 246, this court announced the rule with respect to corroboration in the following language:

"In applying this statute, this court has frequently held that the test of the sufficiency of the corroborative evidence is that it need not be sufficient in itself to sustain a conviction, but it must in and of itself tend to implicate and connect the accused with the commission of the crime charged, and not be consistent with his innocence. It is insufficient if it merely casts a grave suspicion on the accused. *State v. Cox*, 74 Utah 149, 277 P. 972; *State v. Butterfield*, 70 Utah 529, 261 P. 804; *State v. Lay*, 38 Utah 143, 110 P. 986, 987; *State v. Spencer*, 15 Utah 149, 49 P. 302.

"Another test which has been quite generally approved is one suggested in *Welden v. State*, 10 Tex. App. 400, as follows:

" 'Eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no inculpatory evidence, there is not corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.' "

We find sufficient inculpatory evidence in the record to meet the test suggested in the above quotation. The corroborative evidence as to the scheme or plan agreed upon between Lack and the defendant is testified to in part by every witness whose testimony is detailed in this opinion and many others whose evidence was not of sufficient importance to relate. It is conceded that each witness does not testify as to a completed plan of operation, with the exception of Lack; but as the evidence is molded into a pattern the plan takes form and the testimony is sufficient to establish beyond all reasonable doubt that Lack and the defendant were operating together in an illegal venture. That defendant was an executive officer of the state is established by a witness from the Liquor Commission and little, if any, contention is made that testimony as to this element is insufficient.

In connection with the payment of bribes, there are at least two witnesses who corroborate the story told by Lack, and other witnesses whose testimony definitely establishes financial dealings between defendant and Lack. Moreover, the circumstances strongly point to Harries as a major participant. Mr. Young, an employee of the pharmacy, rather rudely interrupted the two when they were dividing up the spoils. Mrs. Herman F. Lund, who was an employee of the Brigham Street Pharmacy, testified that upon two occasions she delivered sealed envelopes to Mr. Harries. These were given to her by Lack with a request that she keep them in the safe or cash register and deliver them to Harries when he came in the store. Mr. Eldon L. Jensen testified that he observed Lack hand-

ing money over to Harries. Furthermore, that Harries and Lack were involved in a division of the money realized from the sale of liquors would seem to be suggested by Jensen's testimony that he was paid $50.00 for the delivery of whiskey in the presence of Harries and the Hatsis testimony that after helping load whiskey for Ossana, he was paid $20.00 by Harries, who was present in the store at the time of loading.

The corroborative evidence with respect to the defendant being influenced not to prosecute Ossana and other violators of the liquor law who dealt with Lack is furnished by the testimony of Mr. Heath, an undercover agent, who testified that he made an official report to Harries of purchases of liquor from Ossana and Williams and no prosecution ensued; the testimony of London that he appeared in Price and Helper dressed in the manner described to Ossana; the testimony of Williams that he was told that Heath would be fired for raiding the Country Club operated by Williams, and the club operated by Ossana, and Heath's testimony that he was fired; the testimony of Myers with respect to the advance information on the appearance of the two undercover women and his testimony concerning his previous arrest and the payment of the $100.00 which was the price agreed upon; the testimony of Hatsis that he loaded the car with ten cases of whiskey at 11 o'clock in the morning while Harries was on the sidewalk some 20 to 30 feet away; and, in addition, the testimony of A. W. Nickas, who testified that after talking with Lack about the purchase of whiskey, Harries appeared and he and Lack went into an adjoining room for a few minutes and returned; that upon their return Lack assured Nickas that everything was arranged and Harries told him to keep lockers in the club and to be careful; that in a conversation in the New Grand Hotel in Salt Lake City, he was present when Harries told Ossana that because of public sentiment Ossana would

have to submit to an arrest; that Harries designated the day that he would send the two undercover women down to make the purchase of drinks; that Ossana told Harries he did not want to be charged with violation because of a previous record; that Harries informed Ossana that he could hire a bar tender and the bar tender would be arrested and charged with the crime; that in a conversation at the Traveler's Motor Court in Price, Harries, in the presence of the witness, informed Ossana that it was necessary that the date of the last raid be changed and that it be held that evening; that Ossana requested that Harries give him an hour to clean up the place and Harries agreed and that Harries later informed him that Ossana's place had been knocked over.

The evidence above detailed, which is independent and apart from the testimony of Lack or Ossana, all comes from witnesses who are not accomplices to the crime charged. It is sufficient, if believed by a jury, to connect the defendant with the offense alleged and corroborates the testimony of those claimed to be accomplices.

It is asserted by the defendant that evidence of other offenses, particularly with reference to the sale of liquor to other clubs, was inadmissible as it tended to convict defendant of crimes with which he was not charged. Evidence of other offenses is admissible when such evidence has a tendency directly to establish the particular crime. In addition, evidence of other like crimes is usually competent to prove a specific crime when it tends to establish motive, intent, the absence of mistake or accident, or a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others. Any pertinent fact which throws light upon the subject under judicial consideration, the accused's guilt or innocence of the crime for which he is charged, is admissible. Such fact is not to be excluded merely because it may also

prove or tend to prove that the accused has committed another similar crime. Relevant and material evidence does not become irrelevant or immaterial merely because it points to other offenses.

Because the prosecution was founded upon a claimed understanding or agreement that defendant would permit individuals including Ossana to conduct and operate clubs and sell whiskey in violation of the Liquor Control Act, and because the defendant's knowledge, intent and general design were put in issue by defendant's plea, it became necesary to show the plan or scheme under which the agreement not to prosecute was carried on. This could be done in part by showing the extent, operation and methods used by Lack and the defendant, and in part by producing evidence of other similar offenses, or transactions. Mr. Wigmore, in Vol. II, Third Edition, page 247, of his work on evidence, states the general principle of law with respect to bribery. I quote paragraph 343:

"On a charge of bribery, any of the three general principles (ante §§ 301-304)—Knowledge, Intent, and Design—may come into play. To show knowledge of the nature of the transaction, a former transaction of the sort may serve, as indicating an understanding of the particular transaction. To show Intent, another transaction of the sort may serve to negative good faith. To show general Design, former attempts toward the same general end may be significant."

As authority for the statement made, Mr. Wigmore cites *State* v. *Sweeney*, 180 Minn. 450, 231 N. W. 225, 227, 73 A. L. R. 380. That was a case involving bribery, accomplices and the introduction of evidence of other and separate offenses. *Mr. Chief Justice Wilson*, speaking for the court, states the rule in bribery cases to be:

"The general rule in a criminal case is that evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible. The reason is obvious, and should be rigorously enforced. The rule, however, like most rules, has certain exceptions not to be stated categorically, but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive; (2) intent; (3) absence of mistake or

accident; (4) the identity of the accused; (5) sex crimes; (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation. Such is the common law.

"We are here interested only in the last-mentioned exception. This exception rests upon system and involves a general and composite plan or scheme. Some connection between the crimes must be shown to have existed in fact and in the mind of the defendant, uniting them for the accomplishment of a common purpose before such evidence can be received. This connection and such system was not shown in *State* v. *Fitchette*, 88 Minn. 145, 92 N. W. 527, upon which defendant herein places such reliance. The evidence in the Fitchette Case did not bring it within any of the exceptions mentioned. That case was controlled by the general rule. The system was shown in this case. All these transactions were corrupt and were for the purpose of corruptly obtaining money through the abuse of a public trust. This was the common aim. Evidence of such other crimes, is admissible, not to establish the other crimes, but as confirmation of the evidence, tending to convict defendant of the crime for which he is on trial."

In the case of the *State* v. *Emory*, 55 Idaho 649, 46 P. 2d 67, 69; the Supreme Court of Idaho had presented before it a question similar to the one now asserted. *Mr. Justice Budge*, speaking for that court, announced the rule in the following language:

"Evidence of other offenses is admissible when such evidence tends directly to establish the particular crime; likewise, evidence of other like crimes is usually competent to prove the specific crime when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others. *State* v. *O'Neil*, 24 Idaho 582, 135 P. 60; *State* v. *Montgomery*, 48 Idaho 760, 285 P. 467; *State* v. *Lowe*, 50 Idaho 96, 294 P. 339; *State* v. *Cochrane*, 51 Idaho 521, 6 P. 2d 489. Any pertinent fact which throws light upon the subject under judicial consideration, the accused's guilt or innocence of the crime for which he is charged and on trial, is admissible; nor is such probative fact to be excluded merely because it may also prove or tend to prove that the accused has committed another crime. *State* v. *Montgomery*, supra. It was clearly established that appellant had asked for and received other bribes at times and from persons other than those charged in the indictment, under the same and like circumstances, and upon the same understanding or agreement as that had with Rose Sage."

The record establishes that the purchase of whiskey by other clubs was part of the general scheme and plan adopted by Lack and Harries and the plan as carried out embraced not only the purchase by one club, but

the purchase by many. The evidence of the other purchases was, therefore, admissible to establish the plan and defendant's intent, motive and the absence of mistake or accident on his part.

One other point bears discussion. There is some claim made that evidence of other crimes is inadmissible in the absence of proof that such other crimes have been committed. Assuming the correctness of that principle in an appropriate setting, it has little if any application to the facts of this case. Here, the plan or scheme under which Lack and the defendant operated was not divisible into separate and distinct small plans. It was a large single operation and each individual transaction with a club threw light on the overall method of operation. The fact that the state did not go far enough to establish a complete offense in every instance does not render the questioned testimony irrelevant. If the admitted evidence tends to prove any element of the crime charged it does not become inadmissible because it might connect the defendant with another crime. Here, the state was not seeking to introduce evidence of separate and distinct offenses, it was seeking to complete the form and structure of the scheme under which the defendant was alleged to have been operating and the evidence which was introduced was admissible for such purpose. All of it was relevant and tended to convict the defendant of the crime for which he was being tried.

Other points raised by the defendant have been considered and are overruled.

The judgment is affirmed.

WADE, WOLFE and McDONOUGH, J. concur.

PRATT, Chief Justice (dissenting).

Most of the assignments of error, in this case, attack the testimony of the participants Lack and Ossana (both

named in the charge) wherein they tell of conversations—not in the presence of accused—between themselves and with others as to a scheme to evade the liquor laws of this state—not the offense charged. Were they accomplices?

We have several sections of our code covering bribery. A bribe is defined in par. (6) of Sec. 103—1—3, U. C. A. 1943, as follows:

"The term 'bribe' signifies any money, goods, right in action, property, thing of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given or accepted with a corrupt intent to influence unlawfully the person to whom it is given in his action, vote or opinion in any public or official capacity."

As to public officers, bribing is grouped under crimes against the Executive Power, 103—26—3, and 4, U. C. A. 1943; crimes against the Legislative Power, 103—26—17 and 18, U. C. A. 1943; and crimes against Public Justice, 103—26—28 and 29, U. C. A. 1943. Each group is made up of two sections, the first of which refers to the participant who seeks to corrupt the public officer; and the second, which refers to the first by the abbreviation "Id." and then sets out the necessary acts of the public officer as a participant.

Each section makes the offense a felony without specific punishment which, under the general penal code of this state, Section 103—1—15, U. C. A. 1943, is punishable by imprisonment in the state prison not exceeding five years.

As the accused in this trial was, at the time of the alleged offense, an executive officer of the state, the following two sections under crimes against the Executive Power are appropriate for discussion:

"103—26—3. BRIBING OFFICERS—FELONY.

"Every person who gives or offers any bribe to any executive officer, or to any peace officer or to any person authorized to enforce the law in this state, with intent to influence him in respect to any act, decision, vote, opinion or other proceeding as such officer, or person authorized to enforce the law, is guilty of a felony."

"103—26—4. *Id.* EXECUTIVE OFFICER ASKING FOR OR RECEIVING.

"Every executive office, or person elected or appointed to an executive office, who asks, receives or agrees to receive any bribe, upon any agreement or understanding that his vote, opinion or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby is guilty of a felony." (Italics added.)

The sections of the other groups are very similarly worded. It seems obvious that the two sections of each group should be read together to determine the nature of the offense of bribery in that grouping, particularly if any issue is raised as to whether or not one of the alleged participants is an accomplice of the other. When read together, we find various ways in which the offense of bribery may be committed. One may be guilty of bribery if he offers the public officer a bribe under circumstances falling within the section requirements, even though the latter does not accept. In such case, the public officer would not be an accomplice, and his testimony about the offer would not need corroboration. The public officer may be guilty of bribery if he asks for a bribe under circumstances evidencing a desire to enter into the agreements or understanding contemplated by the section of the code, even though the other party does not respond. In this latter case the other party is not an accomplice, and his testimony need not be corroborated to convict the public officer. If, however, both participate—that is, the one gives the bribe and the public officer receives the bribe pursuant to the provisions of the sections, they are both guilty of bribery, and each is, as to the other, an accomplice. In other words, when both participate the testimony of each is tainted with unreliability by reason of his own participation in the crime; and the likelihood of his desire to shift a part or all of the responsibility to other shoulders, coloring his accusations. When they act by "agreement or understanding," their action is comparable to a conspiracy to commit crime, each participant (conspirator) being as to the other (his co-conspirator) in the position of an accomplice—one

who aids and abets another in the perpetration of the crime. *State* v. *Bowman*, 92 Utah 540, 70 P. 2d 458, 111 A. L. R. 1393, and *State* v. *Erwin*, 101 Utah 365, 120 P. 2d 285. For a general discussion pro and con upon this subject, see *State* v. *Sweeney*, 180 Minn. 450, 231 N. W. 225, 73 A. L. R. 389. As to responsibility of each see Section 103—1—43, U. C. A. 1943, defining "principals."

The offense charged in the present indictment is that of the "agreement or understanding" between the giver and the public officer. (Note the charge as quoted in the prevailing opinion.) Cyrus Lack is alleged to have given the bribe—and he so testified; and the defendant is the public officer, alleged to have received the bribe—which he denied. The testimony of Lack, then, must be corroborated, before a conviction may be properly obtained. Robert Ossana, mentioned in the indictment, was also a witness; and, as his testimony indicated at the trial, he gave money to Lack, part of which he understood and intended to be, by agreement, passed on to the defendant. Notwithstanding his gifts were one step removed in transit to the accused, they are the same as if he had given them directly to Harries, and he is an accomplice.

Under the Utah Liquor Control Act, the sale of intoxicating liquor by the drink is illegal. The state retains control of the sale of such liquor; and the liquor is sold by the bottle from either state operated stores, which deal only in that commodity; or from what are called package agencies, established in some private business store, such as a drug store. In each case the liquor is sold upon written application of the consumer, who identifies himself by a liquor permit, issued to him. At times restrictions are placed upon the amount of liquor purchased, pursuant to regulation of the Utah Liquor Control Commission. This, in general, is the process of distribution of intoxicating liquor in this state.

For some time it had been the opinion of the commission,

apparently founded upon an opinion of an attorney general, that the individual might purchase his liquor from the state liquor dispensaries, take it to his club, keep it in his locker, and treat his friends to drinks, if he so desired, without violating the Liquor Control Act—the same as is believed to be his right if he took the liquor home, and treated his friends there instead of at the club. Pursuant to such an opinion, it fell to the lot of the enforcement division of the commission to see that the clubs did not overstep the bounds of this interpretation of the law; and, as the defendant Harries was the head of the enforcement division, the responsibilities of such policing fell, to a great extent, upon his shoulders.

The commission seemed to feel that the membership of the old established clubs, such as the Elks Club, American Legion, the University Club, the Alta Club, and others of like purposes and responsibility were those who should be recognized as entitled to such locker room privileges; but that the membership of clubs that mushroomed up, ostensibly for the purpose of taking advantage of such an interpretation should be subjected to investigation by the enforcement division of the commission before they were permitted that privilege. As to all clubs, according to the commissioner, who testified, purchase of liquor by the clubs —as distinguished from its individual members—and the sale of drinks was prohibited; and the clubs were so informed—in fact, many of the clubs, such as those enumerated above, with the exception of the Alta Club, were subjected to legal proceedings for violation of these privileges. The defendant Harries knew of this interpretation and, according to his testimony, made effort to see that all clubs, old line, or newly chartered, lived up to these requirements. These facts show the background of the picture, the details of which were the bed in which was conceived the bribery alleged to have occurred, and which was made the subject of the indictment in this case.

Cyrus V. Lack was first an employee, then later the proprietor of the Brigham Street Pharmacy. This establishment also acted as a package agency for the state in the distribution of intoxicating liquors. Lack and the defendant Harries were friends, and Lack was active in support of defendant's campaign for election as county sheriff. Lack raised money for that campaign, claiming to have obtained it from various individuals, some of whom were interested in the use of intoxicating liquor in either existing clubs, or in establishing clubs wherein such liquor was to be dispensed, ostensibly pursuant to the club privileges mentioned above; but in reality in the purchase and sale of liquor therein. Lack let it become the belief of many that he could sell liquor to clubs without danger of their being prosecuted, except as it might become necessary to temporarily close an establishment for public appearances' sake. He gave out such information as to indicate that his connection with the enforcement division of the Liquor Commission was through the defendant Harries; and that he would sell liquor in case lots, at a premium, over and above the state liquor store price, which premium he would divide with Harries, who would refrain from molesting the purchaser—unless it became necessary for appearances' sake, in which case, the purchaser would be warned ahead of time of the raid, so that he could be prepared; and if his place were closed, it would be temporary, only, and the purchaser could buy his property back at public sale, and could reopen after paying a fine of probably $50 to $100. Lack was visited by the representatives of the various old-line clubs, and also by others seeking to open clubs, and after, *as he said,* consulting Harries, they were included in the list of purchasers from his pharmacy. Liquor was sold in case load lots, hauled away from the store, many times at night, by various persons employed for that purpose. Then a break came, in the form of an announcement, that the Brigham Street Pharmacy had been burglarized,

and many cases of liquor stolen. There followed an investigation and the present prosecution.

I have recited these facts without regard to the question of law raised upon this appeal, as I believe the pictorial background of the case is important in measuring the strength of the efforts of the accomplices to connect Harries to the scheme. The details of that scheme were testified to by Lack, principally, and by others who dealt with Lack, but whose connections to the defendant Harries are questioned. Harries' defense is founded upon a denial of such testimony and a limiting of his financial connection with Lack, to the receipt of campaign funds, and to borrowing money from Lack while in Jackson Hole, Wyoming, upon a vacation trip.

The principal witness for the prosecution was Cyrus V. Lack. He testified along the following lines: In April or May of 1946 he had a conversation with defendant Harries about the latter's campaign for election. Lack was supporting Harries, and this conversation was in the presence of others apparently supporting the defendant. Later, conversations were had concerning the sale of liquor. At one of these meetings a Tony Hatsis was present. At one of the meetings between Lack and Harries, when they were alone, some 60 or 90 days before election, a discussion took place between them about lining up some of the clubs, such as the Elks and the Ambassador Club, both of whom had been asking for liquor. Lack *claimed* that at that time Harries said to not sell to anyone without first talking to him, Harries. The details of sales, delivery and "protection," as set out above, were discussed, and it was agreed between them that they would go 50-50 on all money realized over and above the cost of transportation. Furthermore, deliveries were not to be made until Harries had the "coast clear." About June 1946, Lack met the man named Ossana. The latter was seeking liquor, and had heard about Lack's activities. Lack put him off until after consulting with

Harries, and, as Lack testified having an agreement with him that Ossana should be permitted to buy. Lack subsequently met Ossana and told him the details of the plan, and that he must stand a raid at times; and that he must come to the pharmacy to get the liquor; that he would have protection; and that he, Ossana, would have to pay a bonus for the whiskey. The conversation with Ossana was not in the presence of Harries, and was admitted in evidence over the latter's objections. Pursuant to these conversations, sales of some 30 cases were made to Ossana and premiums paid by him. The evening of the day following the first delivery to Ossana, Lack was in the back of the pharmacy with Harries dividing the money received from Ossana, when a Mr. Young came in.

Mr. Young, a clerk in the package agency, was called and testified that he remembered an occasion of going in the back of the pharmacy when Harries was there, and saw Lack pass some money to Harries, and that Harries remarked that they could make a lot of money out of the deal. What deal was not known to Young, according to Lack. Another sale to Ossana was made which evidently became the foundation of the charge in the indictment— and approximately $15.00 per case bonus was paid.

Ossana was from Helper, Utah. He was a proprietor of the Railroad Club in that town. At one time, according to both Lack and Ossana, Lack called him on the phone after talking matters over with Harries. Harries had informed Lack that the enforcement division was going to have to go to work down around Helper and to call Ossana that he, Harries, was sending a man down there who would be dressed in a hunting suit. These facts Lack reported to Ossana. The agent in hunting clothes succeeded in buying a drink at Ossana's place. This agent was a Mr. London, who did enter the establishment of Ossana in a hunting outfit. He so testified.

Following this line of testimony, Lack proceeded to tell of other contacts with club representatives, along similar lines. All of this testimony was over the objection of defense counsel. In each instance a premium charge was made and according to Lack, divided with Harries.

Robert Ossana, the other party mentioned in the indictment, testified confirming Lack's testimony as to conversations between Lack and Ossana. He also confirmed the testimony of London as to his visit to the Railroad Club in Helper, where liquor was purchased. He first met Harries in 1947, subsequent to the alleged bribe. During that year he had conversations with Harries concerning his place being "knocked over"—that is closed for liquor law violations—in which Harries indicated that he would be closed only for a month or so, and suffer a fine of probably $100.00. Harries also told him, according to Ossana, that he would have to stop buying liquor from Lack, as the latter was through—the implication being that Lack was being dropped for over-stepping the bounds. It was not certain whether violation of the conspiracy agreement was meant, or violation of the liquor laws. He also told of a visit to the Governor, who was apparently making inquiries about Lack's sale of liquor. Ossana claimed he was told by Harries that his place (the Railroad Club) was to be visited by two women for the purpose of obtaining evidence of sales. He saw these women later simulating drunkenness to get into the Club. Ossana also testified to visiting Harries' home and discussing such matters there.

Others who had contact with Lack in line with such a scheme of defeating the Liquor Act provisions testified as to their participation. Included in these conversations, besides Ossana, were a representative of the Ogden Elks; of the Salt Lake Elks; of the Carbon County Country Club; of a tavern in Price, Utah; of the Provo Elks; and of the Fort Douglas Club. The conversations between Lack and each of these gentlemen, of which complaint is made by the

accused, were not in the presence of the accused, and were along the general scheme of liquor law evasion mentioned above. They were objected to by the defense as hearsay and not connected to the crime charged.

There appears to be no question about the fact that, in bribery, evidence of other similar bribes is admissible for the purpose of showing a general scheme to obtain money corruptly through the abuse of public trust. 8 Am. Jur. 903, Sec. 32, and notes. We should not, however, overlook a few facts particularly appropriate to the present case. The volumes of evidence presented, in this case, of the collection of other bribes is such that it can have but one effect upon the accused, and that is of a highly prejudicial character. Even though this evidence is not properly connected to him, one cannot escape the conclusion that in spite of that lack of connection it probably went a long way toward his conviction, particularly if his connection with the Lack-Ossana deal appeared weak to the jury.

The serious question then is: Was the defendant properly connected with these other bribes? We should remember that the testimony about this connection comes principally from the mouth of Lack, the accomplice. We have an offense charged, which in substance is the acceptance of a bribe to protect Ossana. The one who allegedly gave the bribe was Lack. I believe his testimony should be corroborated. Is not that requirement of corroboration true, as well, in those other bribes in which he participated? In each instance, if the only link connecting the accused to those other offenses is the testimony of the accomplice, then those other offenses should not be admitted in evidence; and they should be stricken from the record as prejudicial.

In other words, "similar bribes" are not prima facially proven merely by testimony of an accomplice. His testimony of these bribes is subject to corroboration the same

as his testimony as to the offense charged. Those "similar bribes" are introduced to prove a material point of the offense charged, that is, motive or intent; and yet we have no knowledge that they were in any way connected to Harries, except that Lack, the accomplice in the offense, charged, says they were. There is no reason to believe that he would be any more truthful as to them, than he would as to the offense charged; and if he must be corroborated as to the latter, certainly he should be corroborated as to the former—otherwise the rule of corroboration becomes a farce. The rule then, should be this; similar bribes, to be admissible in evidence must be established by prima facie evidence that they actually occurred and that the accused participated therein; and if accused's connection thereto is established by testimony of an accomplice, that testimony should not be submitted to the jury unless and until it has been corroborated. See *Haley* v. *State*, 84 Tex. Cr. R. 629, 209 S. W. 675, 3 A. L. R. 779, and note to the effect that where evidence of other crimes is admissible as an exception to the general rule, it is admissible only where a prima facie case of guilt of the defendant as to those crimes has been made out. See 20 Am. Jur. 299, Sec. 318 to like effect.

In 4 Nichols, Applied Evidence, 3428, Sec. 11, the rule is stated:

"Where it is competent for the prosecution to prove other crimes similar to the ones charged, the evidence as to the other similar crimes must at least make out a prima facie case that such other crimes were committed by defendant."

For recent cases to like effect see: *Commonwealth* v. *Petrillo*, 338 Pa. 65, 12 A. 2d 317; *State* v. *Cotton*, Iowa, 1948, 33 N. W. 2d 880; *Wrather* v. *State*, 179 Tenn. 666, 169 S. W. 2d 854; *State* v. *Jones*, 27 Wyo. 46, 191 P. 1075. In the case of *State* v. *Patterson*, 347 Mo. 802, 149 S. W. 2d 332, 333, the rule is stated that in order for evidence of other crimes to be admissible

"There must be competent, relevant evidence of the other crimes before it can be said that they are proven".

In the case of *State* v. *Stacey*, 153 Or. 449, 56 P. 2d 1152, involving an appeal from a conviction of receiving stolen property, where evidence of other like offenses was admitted in evidence to show intent, such evidence having been given by an accomplice, the court ruled that proof of other crimes limited to the uncorroborated testimony of an accomplice was not sufficient to entitle such evidence to admission under the exception to the general rule, and that its receipt in the case was highly prejudicial. The court accordingly reversed solely on this ground, although expressly recognizing that in the absence of this evidence there was sufficient other competent evidence to convict.

The prejudicial effect of allowing evidence of other crimes revealed by an accomplice only, is illustrated by the case of *People* v. *Albertson*, 23 Cal. 2d 550, 145 P. 2d 7, 22, a first degree murder trial in which evidence of an assault on the deceased sometime earlier, was admitted in evidence, and the suspicious circumstances surrounding it which tended in some respects to show that the accused had committed the assault. Although dissimilar as to facts, the following quotation reveals a comparable prejudicial effect of using questionable testimony to bolster the case under trial:

"Here, the fact that the circumstantial evidence of the prior merely suspicious occurrences was adduced in great quantity so that it comprises a large part of the voluminous record, cannot serve as a substitute for 'substantiality' where none exists. This erroneously admitted proof shows, if anything, that it must by very reason of its voluminousness have tended to confuse the jurors and warp their judgment. Circumstantial proof of a crime charged cannot be intermingled with circumstantial proof of suspicious prior occurrences in such manner that it reacts as a psychological factor with the result that the proof of the crime charged is used to bolster up the theory or foster suspicion in the mind that the defendant must have committed the prior act, and the conclusion that he must have committed the prior act is then used in turn to strengthen the theory and induce the conclusion that he must also have committed the crime charged. This is but a vicious circle. Here the evidence of suspicious prior occurrences

affords no substantial proof whatsoever connecting defendant in any way with the charge on which he was tried."

Let me then glance briefly at some of the corroborating evidence, which, I think is properly before the court — though standing alone it might not have been sufficient to convince the jury of the guilt of the accused:

In the first place, Lack apparently had some source of information that enabled him to impart to those who sought protection, the approach of an investigation. This is evidenced by the fact that he was able to describe the wearing apparel of London, an investigator who entered Ossana's place—the Railroad Club—and bought liquor. London himself admitted that was the way he was dressed. One witness, Williams of the Carbon County Country Club, spoke of Lack stating that he need have no fears about the transportation problem as a patrolman would protect them from any trouble. A patrolman was employed to haul liquor. A witness, Heath, an investigator for the Commission, told of being sent to Price to get into a club run by a man by the name of Diamanti. He was unsuccessful in getting in, but in the course of his efforts purchased liquor at the Railroad Club (run by Ossana) and at the Price Country Club. These purchases were reported, but the evidence does not disclose any action thereon. Williams, of the Price Country Club, testified that Lack told him that Heath would be fired for being overzealous in his work in Carbon Country, in getting in these places other than Diamanti's. Shortly thereafter Heath was discharged. Tony Nikas testified of a conversation between Harries, Ossana and himself just before Ossana's place was raided, wherein Harries told Ossana that his place would have to suffer a raid; and gave him an hour to prepare for it. Prior to this Harries had told Ossana that he was sending two women as investigators to get into the Railroad Club to get the evidence for the raid on that club, and according to the testimony, Ossana arranged a lease of the premises to the

bartender pursuant to this conversation so that he, Ossana, would not be connected with the transaction. These two women did appear in Price and Helper, and got into the Railroad Club, and assisted in the raid, according to Powell, a liquor agent, who made the raid and the arrest. Tony Hatsis testified that Harries, when he was preparing for his campaign, said that either as sheriff, or in his then present position as liquor enforcement officer, he could afford Hatsis' protection. This statement was made to obtain campaign funds. Duke Hatsis testified to receiving $20.00 from Harries for loading liquor for Ossana and his partner Meyers at the Brigham Street Pharmacy, after Lack had called to Harries to pay him. He also testified to hauling liquor to the Salt Lake Elks Club. On one occasion while he was loading out of the Brigham Street Pharmacy, he saw Harries in his car on the side street next to the Pharmacy, and also saw Harries on the sidewalk on the side street next to the Pharmacy. This occurred during daylight hours. Mrs. Lund, a clerk in the Pharmacy, told of delivering envelopes to Harries. These envelopes, according to Lack, contained money collected pursuant to the understanding between them.

But now let me refer generally to Lack's testimony of his transactions with representatives of the Salt Lake Elks, of the Ogden Elks, of the Fort Douglas Club, and of the Provo Elks. In my opinion it was error to submit this evidence to the jury. These transactions involved thousands of dollars, and hundreds of cases of liquor. If accepted as other cases of bribery, they certainly have a powerful effect as probative of a scheme to evade the liquor law, and, if connected to Harries, certainly are forceful links in establishing his unlawful intentions and the likelihood of having accepted the bribe in the Ossana deal. Their connection to Harries, however, lacks corroboration.

We have before us, then, in this evidence, transactions that have a powerful psychological effect as evidence of a

criminal intent in a bribery charge, without corroborating evidence identifying the accused as a participant in any of them. Such evidence is highly prejudicial to the accused, as it builds up a tower of culpability in the evasion of our liquor laws, which lulls the uninitiated mind into overlooking the fact it all may be true, and yet not be connected to the accused.

In view of the fact that such evidence is bound to influence the minds of the jurors with the idea of a very bad case of law evasion, it may have supplied the weight of evidence that resulted in a verdict against defendant which would not have been the result had the jury been limited to the corroborating evidence I mentioned, first above, as properly before the court.

A new trial should be granted.